PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROSA QUINTANA and CORY
HICKERSON, individually, and as
personal representatives of the Estate
of Ricardo Jose Ortiz, deceased,

        Plaintiffs - Appellants,

    v.

SANTA FE COUNTY BOARD OF
COMMISSIONERS; ANNE
ROBINSON, in her individual
capacity; DYLAN CHAVEZ, in his
individual capacity; ANTHONY
VALDO, in his individual capacity;
TYLER LOPEZ, in his individual
capacity; LEONARD GARCIA, in his
individual capacity; CRISTOBAL
GALLEGOS, in his individual
capacity,

        Defendants - Appellees.

--------------------------------------------

THE RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER,

        Amicus Curiae.

No. 19-2039

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:18-CV-00043-JB-LF)**

Alicia C. Lopez (Carolyn M. "Cammie" Nichols with her on the briefs), Rothstein Donatelli LP, Albuquerque, New Mexico, for Plaintiffs-Appellants.

Mark E. Komer, Long, Komer & Associates, P.A., Santa Fe, New Mexico (Jonas M. Nahoum, Long, Komer & Associates, Santa Fe, New Mexico, and Christa M. Hazlett and Carol Dominguez Shay, Conklin, Woodcock & Ziegler, P.C., Albuquerque, New Mexico, with him on the brief), for Defendants-Appellees.

David M. Shapiro, Roderick & Solange MacArthur Justice Center and Northwestern Pritzker School of Law, Chicago, Illinois, for Amicus Curiae.

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **CARSON**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

Following the January 2016 death of Ricardo Jose Ortiz at the Sante Fe Adult Detention Facility (ADF), Ortiz's personal representatives sued multiple individual ADF affiliates, alleging state claims under the New Mexico Tort Claims Act and violations of his Fourteenth Amendment right to medical treatment under 42 U.S.C. § 1983. The defendants moved to dismiss the first amended complaint (FAC), and the plaintiffs moved to amend their complaint to include a claim for municipal liability that was not in any prior complaint. In an order addressing both motions, the district court dismissed the § 1983 claims, denied the plaintiffs leave to amend to include that municipal liability claim, and remanded the state-law claims.

On appeal, the plaintiffs-appellants argue the district court erred in dismissing the § 1983 claims against individual prison employees and in denying leave to amend.

We agree that the plaintiffs-appellants plausibly alleged Officer Chavez violated Ortiz's clearly established constitutional right to medical care for acute symptoms related to his withdrawal from heroin. But we cannot conclude they plausibly alleged the other individual defendants violated Ortiz's clearly established constitutional right to medical care under these circumstances. Therefore, we VACATE the district court's dismissal with regard to Officer Chavez but AFFIRM with regard to the other individual defendants.

Separately, we conclude the district court should not have denied the plaintiff leave to amend for reasons of futility. The district court determined that the plaintiff could not state a claim for municipal liability without first properly stating a claim against an individual, but our court's precedent allows municipal liability even where no individual liability exists.

We accordingly VACATE the district court's denial of leave to amend.

## I. Background

Ortiz was arrested and booked into ADF on January 4, 2016. After booking, Defendant Nurse Anne Robinson conducted a medical intake exam, apparently without completing various intake forms. During the exam, Nurse

Robinson determined that Ortiz was dependent on heroin and would likely undergo withdrawal. She therefore offered Ortiz a set of medications known as a "kick kit." The plaintiffs allege the kick kit was never administered.

The other individual defendants—Corporal Gallegos and Officers Chavez, Valdo, Lopez, and Garcia—supervised or interacted with Ortiz in some capacity between his medical exam on January 4 and his death on January 7. By their own admission, they were aware that Ortiz was experiencing withdrawal symptoms. They did not attempt to provide any further medical assistance, and Ortiz did not request any further treatment.

On January 7, Officer Garcia found Ortiz unresponsive and disrobed in his cell, the floors and walls of which were partially covered in feces and bodily fluids. Attempts to revive him were unsuccessful. Following an autopsy, it was concluded that Ortiz "died of an acute gastrointestinal hemorrhage due to probable heroin withdrawal." App., Vol. 1 at 34.

In January 2018, the plaintiffs filed a law suit in New Mexico state court, alleging a claim under the New Mexico Tort Claims Act and a claim against only Nurse Robinson under § 1983 for deliberate indifference to Ortiz's serious medical needs. The case was removed to federal district court, and the plaintiffs filed the FAC, which included claims against all the individual defendants under § 1983. Soon thereafter, the defendants filed a motion to dismiss the § 1983

-4-

claims on qualified immunity grounds. The plaintiffs opposed that motion and moved for leave to file a second amended complaint (SAC).

In their motion to amend, the plaintiffs explained that they wanted to make several material changes to their complaint. The most significant proposed amendment was an entirely new claim against Sante Fe County for municipal liability under *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978). The SAC also contained amendments to the preexisting claims. According to the motion to amend, the SAC was meant, in part, to address the defendants' concerns regarding the state-law and § 1983 claims. But the motion said that the changes to the § 1983 allegations were not material, as the claims were fully stated in the FAC. App., Vol. 1 at 135 (stating the rewritten paragraphs attempting to state claims against the individual defendants "contain only allegations previously set forth in the operative [i.e. First Amended] Complaint").

The district court granted in full the defendants' motion to dismiss the § 1983 claims based on qualified immunity. In the same order, the court also denied the motion to amend because the proposed SAC would not have cured the various deficiencies in the § 1983 claim and because it did not properly state a *Monell* claim as a matter of law. Having disposed of the various federal questions giving rise to the district court's subject matter jurisdiction, the court remanded the surviving state-law issues to state court.

-5-

## II. Discussion

### A. Qualified Immunity

Our qualified-immunity inquiry requires a plaintiff to allege that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation. *E.g.*, *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019) (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)). We have described this burden as "heavy," in large part because our qualified-immunity inquiry "is designed to spare a defendant not only unwarranted liability, but [also] unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit." *Medina*, 252 F.3d at 1128 (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quotation marks omitted)).

Here, the plaintiff has failed to allege plausibly a clearly established constitutional violation against any of the six individual defendants other than Officer Chavez.

In making that determination, we look to the FAC and not the proposed SAC. As we explain below, a de novo review reveals the district court should not have denied the plaintiffs' motion to amend the complaint to add a separate claim against the county for municipal liability. The district court did not, however, err in denying the motion with regard to allegations against the various individual plaintiffs.

As that court noted, the plaintiffs specifically argued in their motion to amend that their proposed amendments to Count II—i.e. the count alleging individual liability—were not "substantive amendments," clarifying that "while the paragraphs under Count II are partly rewritten, they contain only allegations previously set forth in the operative complaint." App., Vol. 1 at 135. That is, the plaintiffs themselves explicitly denied that the SAC would in any way cure deficiencies in the FAC with respect to the allegations in Count II. The district court was under no obligation to consider an argument that the movant not only did not raise but explicitly discredited and disowned.

Because any argument that the district court erred in denying the motion to amend with regard to Count II of the complaint is waived, we do not consider the allegations made in the SAC as opposed to the allegations made in the FAC.

### 1. *Constitutional Violation*

In assessing the plaintiff's contention that the individual defendants violated Ortiz's Fourteenth Amendment rights, we apply the two-part Eighth Amendment inquiry when a pretrial detainee alleges deliberate indifference to serious medical needs.[1] *E.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985)). This

---

[1] We also endorse Judge Bacharach's rejection of the argument that *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), requires us to conduct only an objective inquiry.

exercise requires both an objective and a subjective inquiry. *Id*. (citing *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)).

The objective inquiry asks whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Id*. (quoting *Mata v. Saiz*, 427 F.3d 745, 752–53 (10th Cir. 2005) (quotation marks omitted)). The subjective inquiry, in turn, asks whether "the defendants knew [the detainee] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id*. (quoting *Callahan*, 471 F.3d at 1159 (quotation marks omitted)).

### a. *Objective Inquiry*

As we have observed, "[a] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). No Tenth Circuit authorities have concluded that heroin withdrawal presents a "sufficiently serious" medical need.[2] But the absence of precedent "on all fours" need not

---

[2] Looking primarily to out-of-circuit authorities, Judge Bacharach's opinion fashions a reasonable case that symptoms associated with heroin withdrawal present a "sufficiently serious" medical need. We do, however, note that three of these cases deal with alcohol withdrawal. *See Lancaster v. Monroe*

(continued...)

foreclose this conclusion. We assume—without deciding this question—that the *severe* opioid withdrawal Ortiz experienced *does* satisfy our requirements for a "sufficiently serious" medical need. We now turn, then, to whether the plaintiffs alleged the individual defendants knew that Ortiz was experiencing such serious withdrawal and disregarded that fact.

### b. Subjective Inquiry

With respect to the subjective component of our Eighth Amendment inquiry, we begin by noting the Supreme Court has insisted upon actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphases added). It is true a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842. But our precedent effectively cabins this exception by requiring that such risks present themselves as "obvious" to the so-called "reasonable man." *See Mata*, 427 F.3d at 752 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

---

[2](...continued)
*Cty.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). The fourth addresses withdrawal from methadone. *See Foelker v. Outagamie Cty.*, 394 F.3d 510, 511–13 (7th Cir. 2005).

We have previously held that unconsciousness presents such an "obvious" risk. *See Garcia*, 768 F.2d at 308. We have likewise held that "a gangrenous hand or a serious laceration" would also present an "obvious" risk. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (citing *Oxendine v. Kaplan*, 241 F.3d 1272, 1279 (10th Cir. 2001)). But—in the case whose circumstances most nearly match those of this case—we have held that "characteristics . . . common to many intoxicated individuals" do not present an "obvious" risk. *See Martinez*, 563 F.3d at 1091.

In our view, frequent vomiting alone does not present an obvious risk of severe and dangerous withdrawal. *See id.* For clarity, as further explained below, we agree that the *bloody* vomiting Officer Chavez allegedly knew of does present an obvious risk. After all, blood would imply to a reasonable detention official that there is an actual internal injury. But since the complaint limits this allegation to Officer Chavez, we see no reason to export allegations of this knowledge onto the other individual defendants.

With this framework in mind, we consider whether the complaint plausibly alleges that the six individuals at issue—Officer Chavez, Officer Valdo, Nurse Robinson, Officer Lopez, Officer Garcia, and Corporal Gallegos—knew that Ortiz "faced a substantial risk of [serious] harm and disregarded that risk, by failing to

-10-

take reasonable measures to abate it." *See id.* at 1088 (quoting *Callahan*, 471 F.3d at 1159 (quotation marks omitted)).

### i. Officer Chavez

According to the FAC, Officer Chavez observed Ortiz on January 4 when the latter "appeared sick and vomited numerous times." App., Vol. 1 at 27. The FAC further alleges: "Mr. Ortiz informed Officer Chavez that he was withdrawing from heroin and was 'throwing up blood.'" *Id.* The presence of blood in vomit makes the presence of a serious medical need more plausible and more obvious. In our view, taking the allegations as true, a jury could conclude the seriousness of the medical risks associated with vomiting blood would be obvious to any reasonable observer. *See Mata v. Saiz*, 427 F.3d at 752 (citing *Garrett*, 254 F.3d at 950).

### ii. Officer Valdo

The complaint alleges Officer Valdo met with Ortiz approximately one day after arriving at ADF in order to assign him a housing unit. It further alleges that, at the time of the meeting, Ortiz appeared "severely ill" and requested to be housed in "safe keeping." App., Vol. 1 at 28. The complaint does not suggest what symptoms Ortiz was exhibiting that would have made Officer Valdo suspect he was "severely ill," nor does it explain how a request for being housed in "safe keeping" implies a medical need. Given the sparsity of the allegations, we cannot

-11-

conclude the FAC plausibly alleged that Officer Valdo knew that Ortiz "faced a substantial risk," let alone disregarded it.

### iii. Nurse Robinson

The complaint alleges that Nurse Robinson knowingly disregarded a substantial risk of serious harm because she conducted a deficient intake and failed to implement a withdrawal protocol for Ortiz. But so, too, does it acknowledge that Nurse Robinson offered Ortiz a kick kit, which contained medication selected to mitigate symptoms associated with withdrawal.

Although the complaint also alleges that Ortiz never received these medications, it does not allege that Nurse Robinson was responsible for this failure. Under current law, we do not believe the risk posed by these circumstances would have been obvious to Nurse Robinson.

We accordingly conclude the complaint does not plausibly allege that Nurse Robinson disregarded a substantial risk of serious harm to Ortiz.

### iv. Officer Lopez

The complaint alleges only that Officer Lopez knew Ortiz had vomited in his cell and exhibited other common signs of withdrawal. Absent something more—like knowledge of *bloody* vomit—the complaint does not plausibly allege deliberate indifference to serious withdrawal. *See Martinez*, 563 F.3d at 1091 (concluding that "characteristics . . . common to many intoxicated individuals"

were not "obvious symptoms indicating a risk of serious harm"). We accordingly conclude the complaint does not plausibly allege that Officer Lopez disregarded a substantial risk of serious harm to Ortiz.

### v. Officer Garcia

The complaint alleges neither that Officer Garcia actually saw Ortiz in distress nor that Ortiz ever sought medical assistance from Officer Garcia. We accordingly conclude the complaint does not plausibly allege that Officer Garcia disregarded a substantial risk of serious harm to Ortiz.[3]

### vi. Corporal Gallegos

In much the same vein, the complaint details no specific allegations regarding Corporal Gallegos's awareness of Ortiz's illness. Nor can we impute actual knowledge of Ortiz's medical needs upon Corporal Gallegos from the complaint's spare observation that he heard Ortiz "pushing" and "making noises" on the toilet. We accordingly conclude the complaint does not plausibly allege that Corporal Gallegos disregarded a substantial risk of serious harm to Ortiz.

\* \* \*

---

[3] The dissent contends that Ortiz's death—which transpired 25 minutes after the complaint alleges Officer Garcia had seen him last—"was neither quick nor quiet," and that his "medical distress would have been obvious." Bacharach Op. at 30. The complaint, however tells us only that Ortiz died from a massive internal hemorrhage. Absent some legal or medical authority that indicates otherwise, speculation alone cannot impute knowledge of a constitutional dimension upon Officer Garcia.

-13-

In sum, the complaint does not plausibly allege that Officer Valdo, Nurse Robinson, Officer Lopez, Officer Garcia, or Corporal Gallegos consciously disregarded Ortiz's serious medical needs.

### 2. *Clearly Established Law*

We next consider whether any plausibly alleged constitutional violations satisfy our rigorous standards for "clearly established" law. Officer Chavez's alleged conduct did violate clearly established law. Conversely, even if the complaint had properly alleged constitutional violations against the other individuals, we would still conclude the relevant violations nonetheless failed to satisfy our standards.

The Supreme Court has explained "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted). Although we need not "require a case directly on point," it is nonetheless the case that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (citations and quotation marks omitted).

This requirement reflects the Court's recognition that qualified immunity is meant to "protect[] all but the plainly incompetent or those who knowingly violate the law." *Id*. (citations and quotation marks omitted). The Supreme Court has

"repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id*. (citations and quotation marks omitted). And the Court has likewise emphasized "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (citations and quotation marks omitted) (emphasis in original). Such an inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. (citations and quotation marks omitted).

The plaintiff contends "the fact that the officials were shown to have disregarded the plaintiff's serious medical need was sufficient to establish that they knew they violated [his] rights." Aplt. Br. 43. Bearing in mind the Supreme Court's insistence upon both specificity and fair notice, we disagree. *See Mullenix*, 136 S. Ct. at 308. Where prior cases establish the "obviousness" of a medical need, conscious disregard of that need alone may suffice. But as we discussed above, the only individual defendant who consciously disregarded Ortiz's serious medical need was Officer Chavez.

### a. Nurse Robinson

We have held that need for medical treatment is "obvious" when "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency." *Self*, 439 F.3d at 1232. But the complaint never alleges that Nurse Robinson was presented with

*recognizable* symptoms that might create a medical emergency. Nor does it contend that she completely denied Ortiz care.

Upon intake, the complaint alleges Ortiz informed Nurse Robinson that he would suffer withdrawal from his heroin addiction. The complaint does not allege he presented *any* symptoms of illness to Nurse Robinson, let alone symptoms that might indicate a medical emergency. Moreover, the complaint concedes she offered to provide Ortiz with a kick kit, which contained a number of medications designed to ameliorate the symptoms associated with withdrawal. Although—for reasons that remain unclear—he never received this medication, we cannot read the complaint to conclude that Nurse Robinson completely denied Ortiz necessary medical care.

In the absence of authorities that would alert Nurse Robinson to the fact that her failure to complete all intake forms and her apparent failure to ensure Ortiz actually received the kick kit amounted to a violation of Ortiz's constitutional rights, we conclude the complaint does not plausibly allege that she breached clearly established law.

### b. *Corporal Gallegos and Officers Valdo, Lopez, and Garcia*

No Tenth Circuit authorities support the conclusion that Officer Valdo, Officer Lopez, Officer Garcia, and Corporal Gallegos violated Ortiz's clearly established right to medical treatment. Nor can we read out-of-circuit authorities

-16-

that address medical conditions other than withdrawal from heroin to place the lawfulness of their conduct "beyond debate." *See Mullenix*, 136 S. Ct. at 308.[4]

No authority, in our view, clearly establishes with the requisite degree of specificity that the officers violated Ortiz's constitutional right to medical care for symptoms associated with heroin withdrawal. *See id.* (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established"(emphasis in original) (quotation marks omitted)). In the absence of such authorities, we conclude the complaint does not plausibly allege Corporal Gallegos or Officers Valdo, Lopez or Garcia breached clearly established law.

---

[4] The dissent cites (1) *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019), where the Eleventh Circuit denied summary judgment where guards withheld treatment from a detainee who claimed he had been hit by a car prior to his arrest; and (2) *Westlake v. Lucas*, 537 F.2d 857, 859 (6th Cir. 1976), where the Sixth Circuit denied a motion to dismiss when guards denied an inmate treatment for a bleeding ulcer. In our view, neither case provides fair notice that frequent vomiting alone constitutes a serious medical need. Nor does the Eighth Circuit's decision in *Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009), where prison officials had mistakenly attributed a detainee's repeated vomiting to the ingestion of shampoo, rather than the heart attack that ultimately killed him. Although this decision *might* clearly establish a constitutional right to medical care for repeated vomiting, no matter the cause, within the *Eighth* Circuit, we cannot endorse the suggestion that one out-of-circuit authority has "placed [this] statutory or constitutional question beyond debate." *See Mullenix*, 136 S. Ct. at 308 (citations and quotation marks omitted).

### c. Officer Chavez

That said, Officer Chavez's conduct *did* violate clearly established law by consciously disregarding obvious symptoms not just of heroin withdrawal but of a serious internal injury. Far before Officer Chavez interacted with Ortiz, we held "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quotation marks omitted). And we had held that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of" the detainee's rights. *Mata*, 427 F.3d at 745; *see also Sealock*, 218 F.3d at 1210-11 (holding a prison officer plausibly violated a detainee's rights by not addressing the detainee's symptoms even when he knew they might be related to a heart attack). Thus, prior to January 2016, it was clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights. Officer Chavez's inaction in the face of Ortiz's bloody vomiting therefore violated clearly established law.

## B. Leave to Amend

Finally, we consider whether the district court properly rejected the plaintiffs' request for leave to amend the complaint. We review the district

-18-

court's denial of leave to amend for an abuse of discretion. *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010). Although district courts enjoy discretion, they "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001) (reiterating that courts should grant leave to amend when an amended complaint could "yield a meritorious claim"). Thus, "when denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1249 (10th Cir. 2009).

In this case, the plaintiffs sought leave to amend to add a *Monell* claim under § 1983 against Santa Fe County for its allegedly deficient medical intake protocol. *See Monell*, 436 U.S. at 690 (providing that plaintiffs may sue local governing bodies directly under § 1983 for constitutional violations pursuant to a body's policy, practice, or custom). The district court concluded that amendment would be futile because the plaintiffs could not state a *Monell* claim without a viable claim against an individual defendant. But that blanket justification does not square with circuit precedent holding that municipal liability under *Monell* may exist without individual liability.[5] *Garcia v. Salt Lake Cty.*, 768 F.2d 303,

---

[5] We determine above that the complaint plausibly alleges only that Officer Chavez—who had nothing to do with intake protocol—violated Ortiz's clearly established right to medical treatment.

310 (10th Cir. 1985) ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."). Indeed, we concluded in *Garcia* that even where "the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* Thus, in light of *Garcia*, the district court's legal basis for its finding of futility is contrary to our circuit's precedent.

But that does not end the inquiry. Although the district court's finding of futility is not consistent with *Garcia*, the proposed amended complaint must still allege facts that, under *Garcia* and *Monell*, plausibly state a cause of action against Santa Fe County. To state a claim against the County, the plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). The plaintiffs' proposed amendment alleges: (1) Santa Fe County maintained an unconstitutional custom of failing to treat detainees for withdrawal, which resulted in a deficient medical intake protocol, (2) that custom caused Ortiz's injury, and (3) the County's actions (or inaction) stemmed from deliberate indifference. Although we are not sure whether the plaintiffs can prove each of those elements at trial or even survive summary

-20-

judgment, they allege sufficient facts supporting each element for their claim to proceed past the motion-to-dismiss stage.

The plaintiffs pleaded facts indicating that Ortiz never received or did not take the kick kit withdrawal medications. That allegation supports the plaintiffs' claim that the jail had a process problem—even though we cannot pin the failure to administer the kick kit on any one individual. The plaintiffs also pleaded that three other inmates at the same jail recently experienced withdrawal-related deaths. And a 2003 Department of Justice study put Santa Fe County on notice about deficiencies in the jail's "intake medical screening, assessment, and referral process." App., Vol. 1 at 183–84. The plaintiffs further allege that these deficiencies contributed to Ortiz's death. Finally, the plaintiffs alleged that the jail previously provided Ortiz with deficient intakes over the course of eight separate incidents of incarceration at the jail. Altogether, the allegations of intake failures preceding Ortiz's death and past process failures sufficiently state a *Monell* claim at this early stage in the proceedings. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."). Thus, we conclude that the proposed amendment would not be entirely futile in this case.

Of course, we cannot determine from the face of the proposed amendment whether the plaintiffs will be able to substantiate their *Monell* claim. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks and citations omitted)). So we conclude—given the low threshold for amendment and low bar for surviving a motion to dismiss—the plaintiffs alleged enough to explore their *Monell* claim in the discovery process. *See id.* (observing that "granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice" (quotation marks, alterations, and citation omitted)). We thus vacate the district court's denial of leave to amend and remand for further proceedings consistent with this Order.

## III.  Conclusion

In sum, we conclude the complaint does not plausibly allege that Nurse Robinson, Officer Valdo, Officer Lopez, Officer Garcia, and Corporal Gallegos each violated Ortiz's clearly established constitutional right to medical care for acute symptoms related to his withdrawal from heroin addiction. It does, however, plausibly allege a claim against Officer Chavez, so we vacate the dismissal with regard to him. We further conclude the district court abused its

discretion in denying the plaintiffs leave to amend because they could plausibly state a claim for *Monell* liability. Our case law permits a plaintiff to bring a *Monell* claim even where there is no individual liability, and the plaintiffs' allegations satisfy pleading requirements.

No. 19-2039, *Quintana, et al. v. Santa Fe County Board of Commissioners, et al.*

**BACHARACH**, J., concurring in part and dissenting in part.

Mr. Ricardo Ortiz was arrested for stealing a handbag and booked into Santa Fe County's detention facility. When he was booked, Mr. Ortiz had a heroin addiction and expected to experience severe withdrawal. And he did. As Mr. Ortiz's withdrawal spiraled, officials allegedly failed to provide treatment. He died three days later.

On behalf of Mr. Ortiz's estate, the plaintiffs sued six employees of the detention facility, invoking 42 U.S.C. § 1983[1] and alleging that the employees had violated the Fourteenth Amendment's Due Process Clause by exhibiting deliberate indifference to Mr. Ortiz's serious medical needs. After an initial amendment, the plaintiffs moved to amend the complaint a second time, adding allegations against the employees and a § 1983 claim against Santa Fe County.

In this appeal, we must credit the allegations in the proposed second amended complaint and construe all reasonable inferences favorably to the plaintiffs. *See* pp. 6–7, below. After doing so, we must answer two questions:

1. Would these allegations state a valid claim against the six employees for denial of Mr. Ortiz's constitutional right to medical care?

---

[1] The plaintiffs also asserted a state-law claim against Santa Fe County, but this claim is not involved in the appeal.

2. Would these allegations state a valid § 1983 claim against Santa Fe County?

I would answer "yes" to both questions.

## I. Mr. Ortiz's Detention and Death

Mr. Ortiz entered the detention facility in January 2016, and Nurse Anne Robinson conducted a medical intake. During the intake, Mr. Ortiz looked ill (according to another inmate) and told Nurse Robinson that he would soon go into withdrawal. Nurse Robinson arranged for a doctor to order medications, but Mr. Ortiz allegedly didn't receive them.

During Mr. Ortiz's first day in the facility, his supervising officer was Officer Dylan Chavez. Mr. Ortiz vomited in front of Officer Chavez and told him that the vomit was bloody.

The following morning, Mr. Ortiz met with Officer Anthony Valdo. Officer Valdo was responsible for assigning an appropriate housing unit.

The next day, Officer Tyler Lopez worked in Mr. Ortiz's housing unit. Officer Lopez allegedly saw vomit on the floor and watched Mr. Ortiz dry heaving.

That night, Officer Leonard Garcia came on duty. According to another inmate, Mr. Ortiz groaned throughout the night.

Officer Garcia and Corporal Cristobal Gallegos contend that they checked on Mr. Ortiz the next morning and saw that he was not in distress. For example, Corporal Gallegos states that he was not alarmed after

2

passing Mr. Ortiz's cell and hearing him pushing and making noises on the toilet. And Officer Garcia asserts that he saw Mr. Ortiz minutes later.

Within 26 minutes of this alleged interaction with Officer Garcia, Mr. Ortiz died. His corpse was found in a cell covered with blood and feces.

## II.    The District Court's Rulings

The six employees sought dismissal of the first amended complaint for failure to state a valid claim, urging qualified immunity based on a lack of factual allegations reflecting the violation of a clearly established constitutional right. The plaintiffs objected to dismissal and requested leave to file a second amended complaint. The amendment would have supplemented the allegations against the six employees and added a § 1983 claim against the county for an unconstitutional custom and failure to train staff.

The district court granted the defendants' motion to dismiss and denied the motion for leave to amend on the ground that amendment would have been futile. In disallowing the amendment, the court acknowledged that the changes would not have prejudiced the defendants. The plaintiffs appeal the district court's dismissal and denial of leave to file a second amended complaint.

3

### III. The Denial of Leave to Amend the Allegations Against the Six Employees Based on Futility

In my view, the proposed second amended complaint sets forth a valid constitutional claim against each of the six employees. I would thus reverse the dismissal and the denial of leave to file the second amended complaint.

### A. The Relevance of the Second Amended Complaint

As a threshold issue, we must consider whether to examine the first amended complaint or the second amended complaint. I would consider the allegations in the second amended complaint.

The district court concluded that the proposed second amended complaint was "not the product of the Plaintiffs' desire to cure deficiencies." Appellants' App'x, vol. 2 at 376. The majority also declines to consider the second amended complaint, reasoning that "the plaintiffs themselves explicitly denied that the [second amended complaint] would in any way cure deficiencies." Majority Op. at 7. But the plaintiffs didn't idly propose the amendments; instead, the plaintiffs proposed these amendments to cure any perceived shortcomings in the first amended complaint.

As the majority points out, the plaintiffs did argue that the added details had already been encompassed in the first amended complaint. But the plaintiffs recognized that the employees had argued that gaps existed in

4

the allegations. So the plaintiffs said that they had rewritten the allegations to "summarize" or "better clarify" their allegations. Appellants' App'x, vol. 1 at 131. The plaintiffs also stressed that these clarifications were designed to strengthen their claims against the six employees. For example, the plaintiffs argued to the district court that

- "[t]he proposed Second Amended Complaint . . . attempts to resolve Defendants' various issues with the operative [complaint]" and

- "Plaintiffs have taken Defendants' issues with the operative Complaint seriously, and the proposed Second Amended Complaint . . . attempt[s] to clarify allegations that Defendants have either asserted they find obscure, or that Defendants purport to have interpreted differently than Plaintiffs intended."

*Id.* at 128–29 (footnotes omitted). On appeal, the plaintiffs similarly maintain that the second amended complaint "enhanced" the claims against the individual defendants by making "more explicit" and "emphasiz[ing]" allegations encompassed in the first amended complaint. Appellants' Opening Br. at 19–21.

Given the plaintiffs' explanation for the additional allegations, the six employees haven't questioned the need to consider the second amended complaint. The employees instead try to rebut the substance of the second amended complaint. *See* Appellees' Resp. Br. at 38 (responding to allegations in the second amended complaint). Yet the majority insists— sua sponte—that we should completely disregard the proposed

5

amendment's additional allegations against the six employees. I would instead follow the lead of the six employees and consider those allegations.

**B.     The Standard of Review**

We review the denial of leave to amend a complaint for an abuse of discretion. *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010). Though district courts enjoy discretion, they must "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave should be granted when an amendment would "yield a meritorious claim." *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001). When the denial was based on futility, we conduct "de novo review of the legal basis for the finding of futility." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1249 (10th Cir. 2009).

In conducting de novo review, we consider why the district court regarded amendment as futile. The court reasoned that the second amended complaint would not survive a motion to dismiss for failure to state a valid claim. Dismissal for failure to state a valid claim would have been proper only if the second amended complaint had lacked "enough facts to state a claim to relief that [had been] plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

As the majority observes, the threshold is "low . . . for amendment and . . . for surviving a motion to dismiss." Majority Op. at 22. For example, if the six employees had moved to dismiss the second amended

complaint, the court would have needed to view all well-pleaded factual allegations as true and all reasonable inferences in the light most favorable to the plaintiffs. *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 942 (10th Cir. 2016).

Viewing the second amended complaint's allegations in this light, we must consider whether the six employees would enjoy qualified immunity. When qualified immunity is asserted, the plaintiffs must show that the defendants violated a constitutional or statutory right that was clearly established. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

To decide whether the second amended complaint would have satisfied this burden, we would consider

- whether the plaintiffs adequately alleged that the six employees had violated Mr. Ortiz's constitutional right to medical care and

- whether that constitutional right had been clearly established at the time of Mr. Ortiz's detention.

## C. The Employees' Assertion of Qualified Immunity

I conclude that (1) the second amended complaint adequately alleged that the six employees had violated Mr. Ortiz's constitutional right to medical care and (2) the constitutional right had been clearly established.

7

**1.     Violation of the Constitutional Right to Medical Care**

We must first consider whether the plaintiffs' allegations in the second amended complaint entailed a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

County employees can incur civil liability under 42 U.S.C. § 1983 for violating pretrial detainees' constitutional right to medical care. *Barrie v. Grand Cty.*, 119 F.3d 862, 867–68 (10th Cir. 1997). This right is violated when county employees act with deliberate indifference to detainees' medical needs. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The test for liability consists of objective and subjective prongs. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).[2]

The objective prong is satisfied if the prisoner's medical need was "sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). A medical need is sufficiently serious if it was "diagnosed by a physician as mandating treatment or . . . [was] so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).

---

[2]     The subjective prong has been altered for at least some claims involving pretrial detainees. *See* pp. 36–39, below. But we apply the subjective prong as it was clearly established at the time of Mr. Ortiz's detention. *See id.*

The subjective prong addresses the defendant's state of mind. *Mata*, 427 F.3d at 751. Under this prong, we ask whether the defendant

- was aware of a substantial risk of serious harm and

- knowingly disregarded that risk.

*See Martinez v. Garden*, 430 F.3d 1302, 1304–05 (10th Cir. 2005) (aware of a "substantial risk of serious harm" (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996))); *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (knowingly disregards the risk). A plaintiff may prove awareness of a substantial risk through circumstantial evidence that the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The second amended complaint satisfies both prongs of the test for deliberate indifference as to each employee.

a.     **Objective Prong**

The parties agree that the plaintiffs have satisfied the objective prong. But the parties differ on how they define the medical need. In my view, the medical need involved Mr. Ortiz's frequent and bloody vomiting.

The defendants assert that the medical need involved a gastrointestinal hemorrhage, which ultimately led to Mr. Ortiz's death. But the gastrointestinal hemorrhage followed frequent vomiting, which itself could satisfy the objective prong if it was serious enough. *See Mata v. Saiz*, 427 F.3d 745, 753–54 (10th Cir. 2005) (concluding that chest pain

9

was sufficiently serious to satisfy the objective prong independently of a subsequent heart attack).

The second amended complaint alleges that Mr. Ortiz was severely ill and frequently vomited (sometimes vomiting blood) throughout his time in detention. Appellants' App'x, vol. 1 at 159, 163–64, 171 (vomiting on different days); *id.* at 160, 168 (vomiting blood); *id.* at 160, 162 (severe illness). From these allegations, the fact finder could reasonably infer a serious medical need. *See Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (stating that pain satisfied the objective prong when the inmate collapsed, vomited, and suffered severe abdominal pain over a period of five hours); *accord Scinto v. Stansberry*, 841 F.3d 219, 231–32 (4th Cir. 2016) (concluding that a reasonable jury could find an objectively serious medical need based on allegations involving "extreme pain in [the inmate's] stomach, . . . throwing up vomit and blood [and] becom[ing] incontinent").

Other courts have concluded that severe withdrawal symptoms can constitute an objectively serious harm. The Eleventh Circuit, for example, has repeatedly held that "alcohol withdrawal is a serious or urgent medical problem that requires immediate medical attention." *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425–26 (11th Cir. 1997), *overruled in part on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). The Second Circuit agrees. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.

10

2009) (noting the lack of a dispute that severe withdrawal from alcohol had constituted a serious medical condition), *overruled in part on other grounds by Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). And the Fifth Circuit regards delirium tremens (rapid onset of confusion, shaking, and hallucinations attributable to withdrawal from alcohol) as a serious medical need. *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001).

Just as withdrawal from alcohol can constitute a serious medical need when the symptoms are severe, so too can withdrawal from opiates like heroin. *See Foelker v Outagamie Cty.*, 394 F.3d 510, 511–13 (7th Cir. 2005) (concluding that delirium and other symptoms of a forced withdrawal from methadone created a serious medical need). Indeed, the six employees concede that serious withdrawal symptoms could satisfy the objective prong. *See* Oral Arg. at 20:00–:06 ("[I] agree that withdrawal, if serious enough, can meet that objective constitutional threshold under the first prong."). I thus conclude that Mr. Ortiz's frequent and bloody vomiting could plausibly satisfy the objective prong.

The majority assumes, without deciding, that "*severe* opioid withdrawal" could satisfy the objective prong. Majority Op. at 9 (emphasis in original). But the majority concludes that frequent vomiting alone doesn't constitute a serious medical need.

Though the majority discounts the severity of "run-of-the-mill" withdrawal, a fact finder could reasonably find a serious medical need

11

from frequent vomiting associated with heroin withdrawal. Three medical experts explain the early effects of withdrawal from heroin:

> From 6 to 12 hours after stopping heroin . . . , symptoms appear, such as craving for the substance, anxiety, irritability, depression, yawning, sneezing, lacrimation, rhinorrhoea, salivation, sweating, shivering and gooseflesh. The pupils dilate, there are muscle cramps, anorexia, diarrhoea and vomiting.

I.A. Liappas, F.A. Jenner & B. Vicente, Review Article, *Withdrawal Syndromes*, 21 J. Royal Coll. Physicians London 214, 215 (1987). The vomiting itself can lead to "severe medical complications like dehydration" that could result in death. Thomas R. Kosten & Louis E. Baxter, *Effective Management of Opioid Withdrawal: A Gateway to Opioid Dependence Treatment*, 28 Am. J. on Addictions 55, 59, 61 (2019). And the plaintiffs allege that Mr. Ortiz's withdrawal led to his death from irritation and tearing of his esophageal lining. Appellants' App'x, vol. 1 at 171. Given the plaintiffs' allegations, the frequent vomiting would satisfy the objective prong.

The employees present three reasons for us to focus on the gastrointestinal hemorrhage rather than the frequent or bloody vomiting:

1.  In district court, the plaintiffs did not preserve an argument that the medical need involved frequent vomiting.

2.  The plaintiffs do not present any plausible factual allegations regarding bloody vomiting.

3.  The plaintiffs do not allege that any of the employees realized the frequency of Mr. Ortiz's vomiting.

12

Appellees' Resp. Br. at 32–33. Each argument fails.

First, the plaintiffs adequately preserved their argument that the medical need consisted of frequent vomiting. The second amended complaint repeatedly refers to the employees' alleged failure to provide treatment when they saw Mr. Ortiz "in the throes of severe illness." Appellants' App'x, vol. 1 at 158; *see id.* at 159 ("Mr. Ortiz' Display of Severe Withdrawal Symptoms . . . Goes Unaided and Unmonitored"); *id.* at 160 ("Staffers Observe Mr. Ortiz in Severe Heroin Withdrawal, but Fail to Monitor or Assist Him"); *id.* at 177–78 ("multiple Individual Defendants observed [Mr. Ortiz] to be severely ill; and failed to perform critical follow-up monitoring").

The plaintiffs also presented these allegations in the first amended complaint. *See* Appellants' App'x, vol. 1 at 26–28, 37. Opposing dismissal of the first amended complaint, the plaintiffs characterized Mr. Ortiz's symptoms as sufficient to satisfy the objective prong. *Id.* at 94–95. The plaintiffs thus preserved their argument on frequent vomiting by

- focusing in both the first and second amended complaints on the symptoms of Mr. Ortiz's illness and

- relying again on these symptoms when opposing the motion to dismiss.

Second, the plaintiffs adequately allege that Mr. Ortiz suffered frequent bouts of vomiting, sometimes with blood. The second amended complaint contains seven pertinent allegations:

13

1. "Inmate Ronnie Montano – who was housed with Mr. Ortiz during his initial intake on January 4 and who later shared a cell in the Alpha Unit with him for 'approximately one day' afterward – later informed investigators that . . . Mr. Ortiz 'appeared sick and "vomited" numerous times' all over the floor, bed, and toilet." *Id.* at 159.

2. On January 4, "Mr. Ortiz informed Officer Chavez that he was withdrawing from heroin and was 'throwing up blood.'" *Id.* at 160.

3. "Mr. Ortiz' heroin withdrawal symptoms steadily worsened throughout the next two days of his confinement . . . ." *Id.*

4. On January 6, "[Mr. Ortiz's] cellmate, Ronnie Montano, told Officer Lopez that Mr. Ortiz was sick and had vomited in the cell . . . ." *Id.* at 163.

5. "Officer Lopez . . . personally observed Mr. Ortiz 'dry heaving' in his cell in the Alpha Unit at an unspecified time on January 6, 2016, and also saw vomit on the floor." *Id.*

6. "According to Officer Lopez, Mr. Ortiz was 'very quiet,' when not excessively vomiting" on January 6. *Id.*

7. "Significant vomiting from heroin withdrawal caused irritation and tearing of Mr. Ortiz' esophageal lining that resulted in 'bleeding into the stomach and intestines,' which resulted in his death." *Id.* at 171.

These allegations indicate that Mr. Ortiz was frequently vomiting, sometimes with blood.

Third, the extent of the employees' knowledge relates to the subjective prong of deliberate indifference, not the objective prong. The objective prong considers only whether the alleged injury "is sufficiently serious," not whether the defendants knew about the injury. *Mata v. Saiz,*

14

427 F.3d 745, 753 (10th Cir. 2005). So the second amended complaint adequately alleges a severe medical need involving frequent and bloody vomiting.

**b.    Subjective Prong**

The resulting issue is whether the second amended complaint satisfies the subjective prong.

If we credit the allegations in the second amended complaint, Mr. Ortiz experienced "serious harm" consisting of frequent, bloody vomiting and other severe symptoms of withdrawal.[3] *See* pp. 9–15, above. Given the plaintiffs' burden at the pleading stage, they must plausibly allege that a substantial risk of serious harm was obvious to a reasonable person in each employee's position.

If we credit the allegations in the second amended complaint and draw all reasonable inferences in favor of the plaintiffs, each employee

---

[3]    The majority concedes that "a jury could conclude the seriousness of the medical risks associated with vomiting blood would be obvious to any reasonable observer." Majority Op. at 11. But because frequent vomiting is *itself* a serious harm, *see* p. 9, above, the proper subjective inquiry is whether

- each employee had actual knowledge of Mr. Ortiz's frequent or bloody vomiting or

- a substantial risk of frequent or bloody vomiting would have been obvious to a reasonable person in the defendant's shoes.

*See* p. 9, above.

15

would have been aware of a substantial risk of serious harm and knowingly disregarded that risk.

### i. Nurse Robinson

The first employee to see Mr. Ortiz was Nurse Robinson, who conducted the intake. During the intake, Nurse Robinson allegedly failed to complete many of the required procedures and to make various assessments. The allegations against Nurse Robinson in the second amended complaint satisfy the subjective prong.

### (a) Awareness of a Substantial Risk of Serious Harm

These allegations suffice in part because they showed Nurse Robinson's awareness of a substantial risk of serious harm. While conducting the intake, Nurse Robinson allegedly

- had access to records showing a prior diagnosis of Hepatitis C and
- learned that Mr. Ortiz was a heroin user.

And Mr. Ortiz allegedly informed Nurse Robinson that he would undergo withdrawal. Indeed, Nurse Robinson concedes that she expected Mr. Ortiz to suffer withdrawal symptoms.

Aware of Mr. Ortiz's impending withdrawal, Nurse Robinson would have presumably understood the obvious risk that Mr. Ortiz could suffer serious symptoms. Indeed, the protocols existed because of this risk. Given these protocols and Nurse Robinson's awareness of the impending

16

withdrawal, one could reasonably infer that she was aware of an obvious risk to Mr. Ortiz. *See Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) (stating that internal protocols supply circumstantial evidence that a prison's "health care gatekeeper knew of a substantial risk of serious harm"); *see also Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 990 (7th Cir. 2012) (concluding that "[i]f the circumstances suggest that the defendant–official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient" to show actual knowledge (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001))). And if Nurse Robinson would have been aware of the obvious risk, one could reasonably infer that she would have recognized the potential for serious harm. *Sanville*, 266 F.3d at 737.

The defendants argue that Mr. Ortiz did not display withdrawal symptoms during the intake. But this assertion entails a factual dispute. The plaintiffs allege that another inmate saw Mr. Ortiz looking sick during his intake, Mr. Ortiz said that he would experience withdrawal, and Nurse Robinson knew that Mr. Ortiz suffered from Hepatitis C. Given these allegations, Nurse Robinson would have plausibly recognized a substantial risk of serious harm.

The majority questions the obviousness of the risk from Nurse Robinson's knowledge of an impending withdrawal. But the second

17

amended complaint also alleges that Mr. Ortiz's medical needs would have been obvious to Nurse Robinson based on her awareness of Mr. Ortiz's impending withdrawal and his affliction with Hepatitis C. For example, the plaintiffs allege that a national expert had stated that a licensed medical professional like Nurse Robinson "would understand that not referring an inmate suffering from heroin withdrawal – especially one with a serious, chronic condition like Hepatitis C – to the medical unit would be to expose the inmate to the substantial risk of serious harm, including the risk of death." Appellants' App'x, vol. 1 at 157. Together, the allegations in the second amended complaint adequately show Nurse Robinson's awareness of a substantial risk of serious harm.

**(b)  Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

The second amended complaint also contains allegations showing that Nurse Robinson knowingly disregarded the risk to Mr. Ortiz. *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).

The second amended complaint alleges that

- Nurse Robinson conducted a deficient intake and failed to implement a withdrawal protocol and

- the protocol required monitoring and reassessment.

Nurse Robinson downplays these allegations as criticism of her paperwork. But the plaintiffs allege that Nurse Robinson failed to complete any of the

18

required intake procedures even though she had expected Mr. Ortiz to experience severe withdrawal and knew that he suffered from Hepatitis C.

Nurse Robinson also denies deliberate indifference by arguing that she arranged for a doctor to order medication. But the plaintiffs allege that Nurse Robinson failed to take any steps to administer the medication[4] or to implement a protocol for withdrawal.

In the majority's view, the plaintiffs don't allege that Nurse Robinson was responsible for the failure to administer the medication. But the majority is mistaken. The plaintiffs allege that Nurse Robinson gave a false account about the medication. According to the plaintiffs, Nurse Robinson said that Mr. Ortiz had taken the medication, *see* Appellants' App'x, vol. 1 at 158, even though Officer Chavez had told investigators that Mr. Ortiz refused to take any of the medication. *Id.*

Apart from this inconsistency, the plaintiffs allege that Nurse Robinson failed to devise a treatment plan, which would have ensured that Mr. Ortiz received the required medication. *Id.* at 155. We can reasonably

---

[4]    Nurse Robinson relies on her statement that Mr. Ortiz received his first dose of medication and assumes that Mr. Ortiz declined to take the subsequent doses. But the plaintiffs allege that Mr. Ortiz did not receive *any* of the medication, citing inconsistencies between the employees' statements and security videos. Because we view these allegations in the light most favorable to the plaintiffs, *see* pp. 6–7, above, we may reasonably infer that Mr. Ortiz did not receive any of the medication.

19

infer that the creation of a treatment plan would have ensured availability of Mr. Ortiz's medication.

In the second amended complaint, the plaintiffs adequately allege that Nurse Robinson's actions directly resulted in the failure to provide Mr. Ortiz with medication or any other treatment. Given these allegations, Nurse Robinson could incur liability even if she had arranged for a doctor to order medication. *See Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 990 (7th Cir. 2012) (holding that a nurse acted with deliberate indifference even though she referred an inmate to another medical unit and noted that the inmate should be taking psychiatric medication).

\* \* \*

In my view, the second amended complaint adequately alleges a constitutional violation by Nurse Robinson.

## ii. Officer Chavez

On Mr. Ortiz's first day in detention, his supervising officer was Officer Chavez. The allegations against Officer Chavez satisfy the subjective prong.

### (a) Awareness of a Substantial Risk of Serious Harm

The allegations suffice in part because they show Officer Chavez's awareness of a substantial risk of serious harm. The second amended complaint alleges that Officer Chavez

- saw Mr. Ortiz "experiencing symptoms of severe heroin withdrawal" and

- was told by Mr. Ortiz that he had vomited blood.

Appellants' App'x, vol. 1 at 159–60. Because vomiting blood can constitute a serious harm, *see* pp. 9–15, above, these allegations show Officer Chavez's awareness of a substantial risk of that harm.

Officer Chavez argues that as a detention officer, he was "entitled to defer to the professional medical judgment of medical personnel in the care and treatment of detainees." Appellees' Resp. Br. at 45–46. But this argument requires us to disregard other allegations in the second amended complaint. For example, the plaintiffs allege that Mr. Ortiz's condition spiraled downward during his detention. Despite this downward spiral, the second amended complaint does not suggest that Officer Chavez consulted with medical staff or relied on a medical assessment. And the plaintiffs allege that Officer Chavez had been trained to recognize the need for immediate emergency medical attention for inmates vomiting blood during withdrawal.

Together, the allegations in the second amended complaint adequately allege Officer Chavez's awareness of a severe medical need.

**(b)    Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

The plaintiffs also adequately allege that Officer Chavez knowingly disregarded Mr. Ortiz's medical need.

In the second amended complaint, the plaintiffs allege that Officer Chavez told the next shift about Mr. Ortiz's condition, but didn't take any other steps to help Mr. Ortiz or refer him to the medical unit. Reporting Mr. Ortiz's condition would not necessarily constitute a reasonable measure to avert the harm. *See Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (holding that the defendant was not entitled to summary judgment when he had informed the next shift and another official about medical issues but had not taken "any steps to actually secure immediate medical attention"), *abrogated on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). So the plaintiffs adequately allege that Officer Chavez knowingly disregarded a risk of serious harm.

\* \* \*

In my view, the second amended complaint adequately alleges a constitutional violation by Officer Chavez.[5]

---

[5]    The majority concludes that the first amended complaint stated a valid claim against Officer Chavez. I agree. But the majority has disregarded the plaintiffs' effort to supplement their allegations against Officer Chavez.

### iii.  Officer Valdo

Roughly one day after arriving at the detention unit, Mr. Ortiz met with Officer Valdo, who was responsible for selecting the appropriate housing unit. In the second amended complaint, the plaintiffs adequately allege that Officer Valdo violated the subjective prong.

### (a)  Awareness of a Substantial Risk of Serious Harm

The plaintiffs allege that during the interaction with Officer Valdo, Mr. Ortiz had a "severely ill appearance" and requested housing in "safe keeping." Appellants' App'x, vol. 1 at 161. The second amended complaint also alleges that Officer Valdo

- was aware of Mr. Ortiz's diagnosis of Hepatitis C and

- knew from experience and Mr. Ortiz's ill appearance that he needed immediate medical assistance to prevent "an excessive risk of serious harm."

*Id.*

The plaintiffs further allege that Officer Chavez had informed later shifts of Mr. Ortiz's condition. We must view these allegations and reasonable inferences favorably to the plaintiffs. *See* pp. 6–7, above. Doing

---

In my view, the district court erred in disallowing additional allegations even though the existing allegations had stated a valid claim against Officer Chavez. The district court disallowed additional allegations on the ground that amendment would have been futile. Given our unanimous conclusion that the existing allegations sufficed for a valid claim against Officer Chavez, the additional allegations would obviously not have been futile.

so, we can reasonably infer that Officer Chavez's report had reached Officer Valdo. *See Bistline v. Parker*, 918 F.3d 849, 888 n.20 (10th Cir. 2019) (applying the plausibility standard and making a "reasonable assumption" based on facts from a complaint); *see also Sepúlveda-Villarini v. Dep't of Educ.*, 628 F.3d 25, 30 (1st Cir. 2010) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . .").

Together, the allegations in the second amended complaint plausibly establish that Officer Valdo recognized a substantial risk of serious harm.

**(b)    Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

The plaintiffs also adequately allege that Officer Valdo knowingly disregarded this risk. The second amended complaint alleges that Officer Valdo failed to authorize medical treatment for Mr. Ortiz despite knowledge of his medical distress. The plaintiffs thus adequately allege that Officer Valdo knowingly disregarded a risk of serious harm to Mr. Ortiz.

\* \* \*

In my view, the second amended complaint adequately alleges a constitutional violation by Officer Valdo.

24

**iv.     Officer Lopez**

On Mr. Ortiz's third day in detention, Officer Lopez was on duty. The plaintiffs have adequately alleged that Officer Lopez satisfied the subjective prong.

**(a)     Awareness of a Substantial Risk of Serious Harm**

The plaintiffs adequately allege that Officer Lopez was aware of a substantial risk of serious harm. Officer Lopez allegedly

- knew that Mr. Ortiz was withdrawing from heroin,

- knew that Mr. Ortiz was ill and vomiting in his cell,

- observed vomit on the floor,

- saw Mr. Ortiz "dry heaving,"

- saw Mr. Ortiz "look[] sick," quietly staring with a blank look,

- recognized the progression of Mr. Ortiz's symptoms to the point that he had become severely ill, and

- could recognize the need for immediate medical attention for inmates experiencing illness and vomiting from opiate withdrawal.

These allegations showed that the risk of serious harm was obvious to Officer Lopez, suggesting his awareness of the risk. *See Scinto v. Stansberry*, 841 F.3d 219, 232 (4th Cir. 2016) ("Plaintiff's testimony that his cell 'reeked' and his face exhibited visible signs of illness, as well as his contemporaneous account of his symptoms create a genuine factual dispute about whether his need for medical attention was so obvious that

25

an official observing the scene would have . . . inferred that such a substantial risk was present.").

Officer Lopez argues that frequent vomiting may be a "common" characteristic of withdrawal. But a medical need may be severe even when it is common. Heart attacks may be common, but they are undoubtedly serious.

The majority contends that the plaintiffs don't allege that Officer Lopez knew about Mr. Ortiz's condition. But the allegations in the second complaint could reasonably entail awareness of Mr. Ortiz's condition. For example, we can reasonably infer that Officer Chavez's report of Mr. Ortiz's serious condition reached Officer Lopez. And the plaintiffs allege that Officer Lopez observed Mr. Ortiz's distress. Together, these allegations indicate that Officer Lopez was aware of an obvious risk to Mr. Ortiz.

In arguing to the contrary, the majority cites *Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009). But *Martinez* involved different circumstances and a different burden of proof. There Mr. Ginn was arrested for public intoxication and died of a heart attack while in custody. *Martinez*, 563 F.3d at 1084. But the court held that the risk of a heart attack had not been obvious because Mr. Ginn lacked symptoms suggesting an imminent heart attack. *Id.* at 1091. The Court explained that "there was no evidence that [Mr.] Ginn was in pain or distress." *Id.* at 1090.

26

Our facts are different. The plaintiffs allege that Mr. Ortiz was frequently vomiting, sometimes with blood, over the course of three days. Indeed, the majority concedes that the fact finder could reasonably infer that Mr. Ortiz's distress was obvious and required medical attention. And the plaintiffs allege that Officer Lopez knew that Mr. Ortiz was ill. In *Martinez*, the record contained no evidence that the defendant had known of the inmate's pain or distress. *Id.*

Our case differs not only factually but also procedurally. *Martinez* addressed an award of summary judgment, *id.* at 1084; and we are at the motion-to-dismiss stage, addressing only the adequacy of the plaintiffs' allegations about Officer Lopez's awareness of Mr. Ortiz's condition. *See Barton v. Taber*, 820 F.3d 958, 967 (8th Cir. 2016) (stating that the plausibility standard "is a highly deferential standard, as opposed to that at the summary judgment stage")*; Davis v. Howard*, 561 F.2d 565, 570 (5th Cir. 1977) (distinguishing cases because they had originated on motions for summary judgment rather than motions under Rule 12(b)(6)).

Given these factual and procedural differences, *Martinez* does not suggest futility of the second amended complaint. If we credit the allegations in the second amended complaint, Officer Lopez would have recognized a substantial risk of serious harm to Mr. Ortiz.

27

**(b)     Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

In the second amended complaint, the plaintiffs also allege facts showing that Officer Lopez knowingly disregarded this risk. Despite recognizing Mr. Ortiz's need for medical attention, Officer Lopez allegedly failed to obtain any medical help or to do anything to treat Mr. Ortiz's symptoms. The plaintiffs thus adequately allege that Officer Lopez knowingly disregarded a risk of serious harm to Mr. Ortiz.

\* \* \*

In my view, the second amended complaint adequately alleges a constitutional violation by Officer Lopez.

**v.     Officer Garcia**

Two days after arriving at the detention facility, Mr. Ortiz interacted with Officer Garcia. The second amended complaint shows Officer Garcia's awareness of a substantial risk of serious harm and knowing disregard of that risk.

**(a)     Awareness of a Substantial Risk of Serious Harm**

The plaintiffs allege that (1) another inmate heard Mr. Ortiz experiencing violent illness throughout the night, (2) Officer Chavez reported Mr. Ortiz's condition to the next shift, (3) Officer Garcia saw Mr. Ortiz sitting on the toilet, breathing hard, "lying on his bed in the fetal position," and "in the throes of severe illness," and (4) Officer Garcia saw

28

Mr. Ortiz "vomiting and defecating blood[] at 8:20 a.m." Appellants' App'x, vol. 1 at 165, 167–68.

According to the second amended complaint, Officer Garcia maintains that he had asked Mr. Ortiz if he was okay and Mr. Ortiz responded with a hand gesture, which Officer Garcia interpreted as a "yes." But the plaintiffs allege that motion-activated security videos show no sign of an officer approaching Mr. Ortiz's cell when Officer Garcia says that the two men interacted.

Soon after the last alleged interaction, Officer Garcia allegedly found Mr. Ortiz "lying naked across his bed, 'with his body half off,'" with brownish "fluid all over the floor and walls of the cell." *Id.* at 166. His boxer shorts were oozing blood and feces, with "blood trails . . . on his face, coming out of his mouth, his upper arms and shoulders, his rear end, and his lower legs and feet." *Id.* at 169.

Officer Garcia stresses that the plaintiffs do not allege that Mr. Ortiz requested medical care. But the alleged events would have alerted Officer Garcia to Mr. Ortiz's distress even without a request for medical help. *See* p. 43, below (discussing a similar argument relating to the lack of an allegation that Mr. Ortiz had requested medical help). And the plaintiffs allege that Officer Garcia obtained training to recognize the need for immediate medical assistance for inmates withdrawing from heroin. Given this training, a fact finder could reasonably infer that Officer Garcia would

have recognized a serious medical need even if Mr. Ortiz had not requested treatment.

In the second amended complaint, the plaintiffs point out that Officer Garcia denied awareness of Mr. Ortiz's distress, stating that (1) he had checked on Mr. Ortiz three times and (2) Mr. Ortiz had "never presented any sign of discomfort or distress." Appellants' App'x, vol. 1 at 165. But Officer Garcia's statements conflict with other allegations in the second amended complaint, which refer to sounds of Mr. Ortiz's violent illness throughout the night. *See Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (reversing summary judgment for officials when the guards claimed that the detainee had "seemed fine," but other detainees had heard moaning, cries of pain, and pleas for medical help).

Even if Officer Garcia had checked on Mr. Ortiz, he died within 25 minutes of the alleged interaction in a cell engulfed in blood and feces, suggesting that his death was neither quick nor quiet. The extreme disarray in the cell suggests that Mr. Ortiz's medical distress would have been obvious to Officer Garcia. And if the medical distress had been obvious, Officer Garcia presumably would have recognized a substantial risk of serious harm.

In the majority's view, the plaintiffs have not alleged in the first amended complaint that Officer Garcia saw Mr. Ortiz in distress. But the majority has disregarded these allegations in the second amended

30

complaint. There, for example, the plaintiffs allege that Officer Garcia "observed Mr. Ortiz violently ill in his cell, vomiting and defecating blood." Appellants' App'x, vol. 1 at 168.

The majority appears to recognize the significance of this allegation, but disregards it based on the plaintiffs' characterization of their additional allegations as clarification. *See* pp. 4–6, above. The defendants had argued that the allegations in the first amended complaint were too "vague." Appellants' App'x, vol. 1 at 68. But the plaintiffs disagreed with the defendants' narrow reading of the first amended complaint. To eliminate any doubt, the plaintiffs expressly alleged in the second amended complaint that Officer Garcia had seen Mr. Ortiz "vomiting and defecating blood." *Id.* at 168.

The majority elsewhere acknowledges the significance of an allegation that one of the officers had seen blood in the vomit:

> The presence of blood in vomit makes the presence of a serious medical need more plausible and more obvious. In [the majority's] view, taking the allegations as true, a jury could conclude the seriousness of the medical risks associated with vomiting blood would be obvious to any reasonable observer.

Majority Op. at 11.

Though the majority recognizes that seeing blood in the vomit would render Mr. Ortiz's distress "obvious to any reasonable observer," the majority disregards this allegation because the plaintiffs called their changes "clarifying." We should not disregard admittedly critical

31

allegations based on a distorted interpretation of the plaintiffs' characterization of their changes—particularly when the majority recognizes that the additional allegation regarding the observation of bloody vomit would satisfy the subjective prong.

The fact finder could rely not only on the bloody vomit but also on the inconsistencies between the security footage, Officer Garcia's account, and Mr. Ortiz's obvious distress in the minutes before he died. *See Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (concluding that an inmate's statement that officers had actual knowledge of inhumane conditions created a factual dispute for summary judgment because the statement had been "premised on the assertion that those men 'made daily rounds' of [the unit]"); *see also Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 47 (1st Cir. 2012) ("[F]or pleading purposes, knowledge is inferable from other allegations.").

In my view, the plaintiffs' allegations in the second amended complaint support a reasonable inference that Officer Garcia was aware of a substantial risk of serious harm.

**(b)  Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

The plaintiffs also adequately allege that Officer Garcia knowingly disregarded a risk of serious harm. In the second amended complaint, the plaintiffs allege that Officer Garcia did nothing to avert the harm. This

32

alleged inaction could constitute knowing disregard of a risk of serious harm to Mr. Ortiz.

* * *

In my view, the second amended complaint adequately alleges a constitutional violation by Officer Garcia.

**vi.     Corporal Gallegos**

Corporal Gallegos passed Mr. Ortiz's cell three days after his arrival at the detention facility. The allegations against Corporal Gallegos in the second amended complaint suffice under the subjective prong.

**(a)     Awareness of a Substantial Risk of Serious Harm**

These allegations suggest Corporal Gallegos's awareness of a substantial risk of serious harm. According to the second amended complaint, Corporal Gallegos heard Mr. Ortiz "pushing" and "making noises on the toilet." Appellants' App'x, vol. 1 at 166. The plaintiffs also allege that Mr. Ortiz's symptoms had advanced to the point that he "was audibly, seriously ill" while Corporal Gallegos was on duty. *Id.* If these allegations are credited, the sounds presumably would have alerted Corporal Gallegos to Mr. Ortiz's distress. Corporal Gallegos didn't just see and hear the signs of distress; he also presumably received Officer Chavez's report on Mr. Ortiz's medical distress. *See* pp. 23–24, above.

The plaintiffs also allege that Mr. Ortiz died within 37 minutes after Corporal Gallegos had passed the cell. When Mr. Ortiz's corpse was found,

33

his cell was covered with feces, vomit, and blood. Given these allegations, a fact finder could reasonably infer that the risk would have been obvious to Corporal Gallegos when he saw Mr. Ortiz minutes before his death in a cell drenched in feces, vomit, and blood.

Corporal Gallegos also allegedly knew that Mr. Ortiz was experiencing withdrawal from heroin. And Corporal Gallegos allegedly had been trained "to recognize the signs of an inmate in need of immediate medical attention, a category that includes withdrawing inmates . . . who are suffering from symptoms of gastrointestinal illness." Appellants' App'x, vol. 1 at 166–67.

These allegations plausibly suggest that Corporal Gallegos was aware of a substantial risk of serious harm.

**(b)    Knowing Disregard of a Risk of Serious Harm to Mr. Ortiz**

The second amended complaint also alleges that Corporal Gallegos failed to obtain any medical assistance for Mr. Ortiz or take any reasonable steps to avert the harm. These allegations suggest that Corporal Gallegos knowingly disregarded the risk of serious harm to Mr. Ortiz.

\* \* \*

In my view, the second amended complaint adequately alleges a constitutional violation by Corporal Gallegos.

34

**2.     The Existence of a Clearly Established Constitutional Right**

I would conclude that the second amended complaint adequately alleges a constitutional violation by each of the six employees. So even if the first amended complaint had been deficient, these deficiencies would have been cured in the second amended complaint. The resulting issue is whether that constitutional right was clearly established at the time of Mr. Ortiz's detention. I would answer "yes."

**a.     Determining the Existence of a Clearly Established Constitutional Right**

A right is clearly established when "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This inquiry is designed "to ensure that . . . officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

Adequate notice to reasonable officials can come from Supreme Court precedent, a Tenth Circuit opinion on point, or the weight of authority from other circuits. *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). Precedent must be particularized to the facts rather than defined at a "high level of generality." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). But "general precedents may clearly establish the law when the defendant's conduct 'obvious[ly]' violates the

law." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

**b.     The Clearly Established Law During Mr. Ortiz's Detention**

We must determine the contours of the constitutional right that was clearly established during Mr. Ortiz's detention. The plaintiffs argue that the district court misapplied the subjective prong in light of the Supreme Court's opinion in *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466 (2015).[6] There the Supreme Court held that for excessive-force claims by pretrial detainees, the test for deliberate indifference was objective rather than subjective. 135 S. Ct. at 2475–76. But *Kingsley* did not clearly apply to pretrial detainees' claims of inadequate medical care, so the district court did not err in applying the subjective prong for purposes of qualified immunity.

Though *Kingsley* modified the test for deliberate indifference for pretrial detainees' claims of excessive force, the scope of this modification did not become clear until after Mr. Ortiz had died. At the time of his detention, no circuit court had applied *Kingsley* outside of the excessive-force context.

---

[6]     The plaintiffs concede the need to show plain error. But the district court did not err in applying the subjective prong for purposes of qualified immunity, so we need not consider whether an error would have risen to the level of "plain error."

36

Absent such case law, the objective test of deliberate indifference could have been clearly established only if *Kingsley* itself had spelled out its applicability outside of the excessive-force context. *Kingsley*, however, had not spoken to this question.

Circuit courts have thus disagreed over its reach. For example, after Mr. Ortiz's detention, some circuits have concluded that *Kingsley* extends beyond excessive-force claims, effectively abrogating the subjective prong of deliberate indifference whenever pretrial detainees claim a denial of due process.[7] But other circuits have limited *Kingsley* to excessive-force claims.[8] This circuit split suggests that *Kingsley* did not definitively settle the issue.

---

[7] The Second, Seventh, and Ninth Circuits have applied *Kingsley* to various claims by pretrial detainees. *See Darnell v. Pineiro*, 849 F.3d 17, 35–36 (2d Cir. 2017) (applying *Kingsley* to a claim involving conditions of confinement and indicating that the same objective test for deliberate indifference applies to all claims involving the Fourteenth Amendment's Due Process Clause); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (applying *Kingsley* to all Fourteenth Amendment claims involving pretrial detainees); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (stating that *Kingsley* applies to a pretrial detainee's claims involving deficient medical care).

[8] The Fifth, Eighth, and Eleventh Circuits have declined to extend *Kingsley* beyond excessive-force claims. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (declining to apply *Kingsley* because the Fifth Circuit had continued to apply a subjective standard post-*Kingsley*); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) ("*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case."); *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (noting

After Mr. Ortiz's death, we applied *Kingsley* outside of the excessive-force context in *Colbruno v. Kessler*, 928 F.3d 1155 (10th Cir. 2019). *Colbruno* involved a conditions-of-confinement claim, and we held that *Kingsley* had eliminated the need for a pretrial detainee to show an intent to punish. 928 F.3d. at 1163.

According to the plaintiffs, *Colbruno* shows that *Kingsley* abrogated the need for pretrial detainees to satisfy a subjective test for deliberate indifference. But *Colbruno* did not address *Kingsley* in the discussion of a clearly established right. *See id.* at 1163, 1165–66 (examining the applicability of *Kingsley*, but not discussing whether *Kingsley* had clearly established the law prior to the alleged violation). And even after Mr. Ortiz's detention, many Tenth Circuit opinions before *Colbruno* had expressly declined to address *Kingsley*'s applicability to pretrial detainees outside of excessive-force cases.[9]

---

that *Kingsley* applied to an excessive-force claim but not to a claim of inadequate medical treatment).

[9] *See, e.g.*, *Clark v. Colbert*, 895 F.3d 1258, 1269 (10th Cir. 2018) (declining to "revisit the applicable law" because the plaintiff argued only that *Kingsley* had "'held open the possibility that an objective-only standard should apply' . . . [y]et he [did] not argue that *Kingsley* actually displaced any precedent"); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) (declining to address the applicability of *Kingsley* because the parties had not briefed the issue and resolution of the issue would not affect the outcome of the appeal); *Estate of Duke ex rel. Duke v. Gunnson Cty. Sheriff's Office*, 752 F. App'x 669, 673 n.1 (10th Cir. 2018) (unpublished) (declining to consider the *Kingsley* issue because both parties agreed on the use of the subjective standard); *Crocker v. Glanz*, 752

Given the existence of a circuit split and our circuit's frequent avoidance of the issue even after Mr. Ortiz's detention, we conclude that *Kingsley* itself did not clearly establish a purely objective test for all pretrial detainees' claims of deliberate indifference. So even if *Kingsley* applies to medical-care claims, the six employees would have lacked notice of a purely objective test for deliberate indifference.[10] Given the lack of notice, the clearly established right in January 2016 included a subjective test for deliberate indifference.

**c.** **Application to the Employees' Conduct During Mr. Ortiz's Detention**

The second amended complaint adequately alleges that the six employees violated Mr. Ortiz's clearly established constitutional right to medical care. These allegations would defeat qualified immunity if the six employees had moved to dismiss the second amended complaint.

---

F. App'x 564, 569 (10th Cir. 2018) (unpublished) (declining to consider the applicability of *Kingsley* because it had not been raised in district court and would not affect the substantial-rights prong under the plain-error test).

[10] The plaintiffs urge us to clarify the applicability of *Kingsley* even if it does not affect the outcome. But as discussed, *Kingsley* did not clearly apply to medical-care claims at the time of Mr. Ortiz's detention. I wouldn't expound on an issue that's immaterial to the outcome.

### i.     Nurse Robinson

Urging qualified immunity, Nurse Robinson points to a lack of precedent stating that intake deficiencies would violate a pretrial detainee's constitutional rights. But a lack of precedent is not fatal here.

In our circuit, a claim is actionable when the need for medical treatment is obvious. The need for treatment is obvious when

> a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, *e.g.,* a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell.

*Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (citing *Mata v. Saiz*, 427 F.3d 745, 755–59 (10th Cir. 2005), and *Sealock v. Colorado*, 218 F.3d 1205, 1211–12 (10th Cir. 2000)).

In the second amended complaint, the plaintiffs adequately allege that Nurse Robinson failed to address an obvious need for medical treatment. The plaintiffs do not allege just "mistakes in filling out forms, making a diagnosis or predicting future possible complications." Appellees' Resp. Br. at 41. Rather, the plaintiffs allege that Nurse Robinson failed to address an obvious need for medical treatment. *See* pp. 16–20, above.

The plaintiffs' allegations indicate that Nurse Robinson

- knew that Mr. Ortiz was addicted to heroin and had been diagnosed with Hepatitis C,

- expected him to suffer withdrawal,

- knew that the medical protocol required intake assessments and continued monitoring, and

- failed to take steps to make sure that Mr. Ortiz received any treatment.

Her inaction in the face of an obvious medical risk would inherently violate a clearly established constitutional right. *See, e.g.*, *Phillips v. Roane Cty.*, 534 F.3d 531, 545 (6th Cir. 2008) (noting that the law is clearly established that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process" (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005))); *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 422 (7th Cir. 2017). For example, in *Orlowski v. Milwaukee County*, the Seventh Circuit stated:

> The violation alleged by [the plaintiffs] is "clearly established" if [the two correctional officers] had fair and clear warning that their alleged actions (or inaction) would be constitutionally offensive. We find that, assuming the facts most favorable to [the plaintiffs], they did. Correctional officials have long been warned that they cannot ignore an inmate's known serious medical condition. . . . Where a duty imposed by law is obvious to a reasonable officer, we consider it "clearly established." . . . Here, the [plaintiffs' evidence] indicates that [the inmate] presented obvious symptoms of a serious medical condition. So, if we accept these facts as true, any reasonable officer would know he had a duty to seek medical attention. If [the correctional officers] chose to do nothing despite this duty, they violated "clearly established" Eight [sic] Amendment law.

872 F.3d at 422 (citations & footnote omitted).

41

I agree with the Seventh Circuit's reasoning. Because a fact finder could reasonably infer that Mr. Ortiz had obviously needed medical attention, nurses couldn't reasonably think that the Constitution would permit them to do nothing. So if a nurse chose not to respond to an obvious medical need, the nurse would have violated a clearly established constitutional right. *Id.*

According to the plaintiffs, Nurse Robinson simply arranged for medications without taking any steps to ensure delivery to Mr. Ortiz or to complete the required protocols for inmates facing withdrawal. If we credit these allegations, as required, Nurse Robinson's inaction would have violated a clearly established constitutional right.

ii.  **Officer Chavez, Officer Valdo, Officer Lopez, Officer Garcia, and Corporal Gallegos**

The other five employees also deny violating a clearly established right, pointing to a lack of precedents with analogous facts. But prior to Mr. Ortiz's detention, circuit courts had often characterized similar conduct as unconstitutional. *See, e.g.*, *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (holding that guards may have violated the constitutional rights of a detainee who had "spent several hours moaning, crying out in pain, and begging for medical help"); *Westlake v. Lucas*, 537 F.2d 857, 859 (6th Cir. 1976) (holding that a complaint adequately stated a claim under Fed. R. Civ. P. 12(b)(6) when jail officials were aware of a prisoner's

42

ulcer, but did not allow a medical examination even after he had begun vomiting blood).

The defendants try to distinguish these opinions, pointing out that Mr. Ortiz

- didn't ask for medical assistance,

- experienced withdrawal, and

- allegedly declined to take withdrawal medication.

Each argument fails.

First, Mr. Ortiz's constitutional right does not turn on whether he asked for medical assistance. A request for assistance could affect a fact finder's conclusions on the obviousness of the medical need, but a request is not necessary to establish the defendant's recognition of a medical need. *See Youmans v. Gagnon*, 626 F.3d 557, 566 n.12 (11th Cir. 2010) (per curiam) ("A person is not required to request medical care to prevail on a claim of deliberate indifference to a serious medical need."); *see also McCaster v. Clausen*, 684 F.3d 740, 748 (8th Cir. 2012) (concluding that correctional officers could incur liability for deliberate indifference even though the ill prisoner had not personally requested medical help).

Second, Mr. Ortiz had a constitutional right to treatment for his serious medical need even though the need stemmed from heroin withdrawal. *See Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) (concluding that even if the defendants had attributed a prisoner's

43

vomiting to his ingestion of shampoo, the defendants could have recognized a need for medical attention). And other courts of appeals have concluded that the need for medical attention was obvious in similar situations. *See Harper v. Lawrence Cty.*, 592 F.3d 1227, 1237 (11th Cir. 2010) (stating that prior cases "should have put any government actor on notice that delayed or inadequate treatment of alcohol withdrawal would be unlawful"), *abrogated on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

The majority likewise determines that a clearly established constitutional violation is not foreclosed by withdrawal from heroin; otherwise, the claim against Officer Chavez would fail. *See* Majority Op. at 18. Indeed, the majority assumes (without deciding) that Mr. Ortiz's severe withdrawal from opioids would have constituted a serious medical need. *Id.* at 9.

Third, the second amended complaint alleges that the detention facility's staff didn't supply "Mr. Ortiz with the opiate-withdrawal medications he [had] paid for." Appellants' App'x, vol. 1 at 158. In response, the employees argue that Mr. Ortiz declined the medications. But the plaintiffs have adequately alleged contradictory accounts from the employees, *id.* at 157–58, and discrepancies between these accounts and security footage, *id.* at 162–63. The court can't resolve this factual dispute

when assessing whether the proposed second amended complaint states a valid claim. *See* p. 19 n.4, above.

The majority asserts that the cases do not offer "the requisite degree of specificity," contending that the cases "address medical conditions other than withdrawal from heroin." Majority Op. at 17. Yet the majority concedes that for Officer Chavez, it's enough to show that Officer Chavez had ignored obvious and serious medical needs. *Id.* at 18. Why isn't this enough for Officer Valdo, Officer Lopez, Officer Garcia, and Corporal Gallegos? All of them allegedly knew about the frequent vomiting, and Officer Garcia allegedly knew that Mr. Ortiz had blood in his vomit and feces.

The majority argues that only a few circuit cases have recognized a constitutional violation in similar circumstances. But the majority concedes that a fact finder could reasonably infer an obvious medical need. *See* p. 15 n.3, above. Given this concession, what more did the plaintiffs need to allege to defeat qualified immunity? Surely employees in a detention unit didn't need a precedent to tell them that the Constitution prohibited them from ignoring an inmate's frequent and bloody vomiting over a three-day period?

The employees never made such an argument, and it would have been remarkable if they had. Any reasonable employee would have realized that the Constitution wouldn't allow conscious disregard of an inmate

45

experiencing severe withdrawal symptoms and frequent vomiting (sometimes with blood) over the course of three days.

* * *

In sum, the plaintiffs adequately allege in the second amended complaint that

- Mr. Ortiz suffered an objectively serious medical need consisting of frequent vomiting (sometimes with blood) and

- Nurse Robinson, Officer Chavez, Officer Valdo, Officer Lopez, Officer Garcia, and Corporal Gallegos knowingly disregarded a risk of serious harm to Mr. Ortiz.

These employees' alleged disregard of Mr. Ortiz's medical need would have violated a clearly established constitutional right. I would thus reverse the district court's dismissal and the denial of leave to file the second amended complaint to supplement the allegations against the six employees.

## IV. The Denial of Leave to Amend by Adding a § 1983 Claim Against Santa Fe County

The plaintiffs also challenge the denial of their motion to amend by adding a § 1983 claim against Santa Fe County. The district court denied the motion as futile, concluding that the additional claim against the county would not survive a motion to dismiss. I disagree, as the majority does.[11]

---

[11] Though I agree with the majority on the outcome as to this issue, our reasoning differs.

## A.    The Standard of Review

As noted above, the district court disallowed amendment solely on the ground of futility. So we must apply de novo review. *See* p. 6, above.

## B.    Municipal Liability

When engaging in de novo review of a futility determination, we consider the claim that the plaintiffs wanted to add. Here the additional claim would involve municipal liability under 42 U.S.C. § 1983. The plaintiffs contend that Santa Fe County incurs liability based on a custom reflecting deliberate indifference to the serious medical needs of inmates experiencing withdrawal.[12]

For this claim, the plaintiffs must allege a plausible basis to infer

- a custom or official policy,

- causation, and

- deliberate indifference.

*Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 769, 771 n.5 (10th Cir. 2013).[13]

---

[12]    The plaintiffs also allege that the county failed to adequately train its employees to respond to medical needs. Given the adequacy of the plaintiffs' allegation of an unconstitutional custom, we need not address the allegation of inadequate training.

[13]    The county also argues that the plaintiffs must allege a constitutional violation by at least one individual defendant to trigger municipal liability. For the sake of argument, I assume that the county is right. In my view, the second amended complaint adequately alleges constitutional violations by each of the six employees. *See* pp. 7–34, above.

The plaintiffs should have been able to amend the complaint to assert a § 1983 claim against Santa Fe County. The second amended complaint alleges that

- Santa Fe County maintained an unconstitutional custom of failing to treat detainees for alcohol or narcotics withdrawal,

- the county's custom caused Mr. Ortiz's injury, and

- the county's action stemmed from deliberate indifference.

**1. Santa Fe County's Alleged Custom**

In the second amended complaint, the plaintiffs allege that (1) the county acted with deliberate indifference to "the serious medical needs of inmates suffering from alcohol and narcotics withdrawals" and (2) the deliberate indifference was "so persistent, continuing, and widespread as to constitute a custom." Appellants' App'x, vol. 1 at 183.

Plaintiffs can allege an informal custom through a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1986) (White, J., concurring)).

To allege an unconstitutional custom, the plaintiffs point to three pieces of information in the second amended complaint:

1. Mr. Ortiz's history after his prior arrests of "eight inadequate withdrawal evaluations and no follow-up monitoring of his withdrawal symptoms,"

48

2. the Department of Justice's 2003 findings that the detention facility's "'intake medical screening, assessment, and referral process' [had] violated [pretrial] detainees' constitutional rights, including the rights of inmates experiencing withdrawals," and

3. the 2015 and 2016 withdrawal-related deaths of three other pretrial detainees involving the same facility—Dr. Thomas Pederson, Mr. John DeLaura, and Ms. Stacy Lynn Gambler.

Appellants' Opening Br. at 52 (quoting Appellants' App'x, vol. 1 at 183). Together, these allegations reflect an unconstitutional custom.

### a. History of Mr. Ortiz's Intakes

The plaintiffs rely in part on Mr. Ortiz's history of inadequate intakes. The county contends that Mr. Ortiz's history of inadequate intakes cannot contribute to liability because the past deficiencies did not cause an injury. But the plaintiffs need not allege that every deficient intake resulted directly in an injury. Rather, the alleged custom must have been "maintained with deliberate indifference to an *almost inevitable* constitutional injury." *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 769 (10th Cir. 2013) (emphasis added). In my view, the plaintiffs' allegations indicate that the improper intakes created the near inevitability of a constitutional injury.

The county argues that Mr. Ortiz's history of inadequate intakes does not imply a custom because the prior intakes didn't involve identical failings within the intake procedure. But the county urges an unreasonable level of specificity. The plaintiffs allege a pattern of inadequate intakes,

49

not routine disregard of one particular requirement. *See* Appellants' App'x, vol. 1 at 148–52 (detailing a lack of monitoring and incomplete, inaccurate forms at Mr. Ortiz's intakes between June 2013 and February 2015). The alleged pattern of inadequate intakes could reasonably constitute a custom.

### b.    The DOJ Report

The plaintiffs also rely on a 2003 DOJ report, which concluded that the facility's intake process had violated the constitutional rights of pretrial detainees, including those experiencing withdrawal. The county attaches little importance to the report, arguing that (1) it is old and (2) the detention facility was operated by a different entity when the violations took place. The passage of time and change in operators could diminish the persuasive value of the report. But the report could still contribute to the existence of a custom involving deficient intakes.

### c.    The Withdrawal-Related Deaths of Other Pretrial Detainees

The plaintiffs also point to the withdrawal-related deaths of Dr. Pederson, Mr. DeLaura, and Ms. Gambler. The county points out that in each case, the withdrawal involved alcohol rather than heroin. But a fact finder need not disregard the prior incidents just because the withdrawal-related deaths had involved a different substance.

For Dr. Pederson, the plaintiffs allege that the intake nurse didn't "perform a Poly Substance Abuse Assessment 'that would have indicated [a] drinking and complication history and would have helped triage him

50

into the medical unit.'" Appellants' App'x, vol. 1 at 173 (emphasis deleted) (quoting an internal investigation conducted after Dr. Pederson's death). That alleged lapse resembles Nurse Robinson's alleged failure to perform a complete assessment for Mr. Ortiz's heroin withdrawal. *See id.* at 155–56. Given the similarity in the alleged lapses, we can reasonably infer that the intake deficiencies contributed to an unconstitutional custom even though Dr. Pederson's substance differed from Mr. Ortiz's.

The county also argues that an alleged pattern of conduct based on another substance (like alcohol) should require a correspondingly greater "number of similar incidents . . . to show a persistent, continuing, widespread practice." Appellees' Resp. Br. at 65–66. And the plaintiffs do not allege any incidents between 2004 and 2015. At this stage, though, the plaintiffs need only plausibly allege the existence of a custom, which was reflected in these incidents.

### 2. Causation

The plaintiffs must also allege a direct causal link between the custom and the alleged injury. *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 770 (10th Cir. 2013). The plaintiffs satisfy this

51

requirement by linking Mr. Ortiz's injury to the custom of inadequate intakes.

The county argues that the proposed second amended complaint does not link the three other deaths to withdrawal or deficient intakes. I disagree.

The proposed second amended complaint adequately alleges that the prior deaths stemmed from withdrawal. *See* Appellants' App'x, vol. 1 at 173 ("Dr. Thomas Pederson collapsed and died . . . while suffering from severe alcohol withdrawal."); *id.* at 174 ("John DeLaura died of complications from severe alcohol withdrawal."); *id.* at 175 ("Stacy Lynn Gambler was . . . suffering from . . . severe alcohol withdrawals . . . [and subsequently] died.").

The second amended complaint also adequately links the deaths to the deficiencies in the intakes, for the plaintiffs allege that

- Dr. Pederson suffered because "the intake nurse [had] failed to perform critical assessments or sign appropriate forms," *id.* at 173,

- officials had denied "proper medical attention" to Mr. DeLaura, *id.* at 174, and

- officials violated facility policy by improper monitoring and treating Ms. Gambler "with only over-the-counter painkillers and routine alcohol withdrawal medication, even as her condition rapidly deteriorated," *id.* at 175.

And the plaintiffs allege that an internal report linked Dr. Pederson's death to deficiencies in his intake. *Id.* at 173.

52

In combination, the plaintiffs' allegations satisfy the element of causation.

### 3. Deliberate Indifference

Finally, the plaintiffs must plausibly allege facts showing that the municipal action stemmed from "'deliberate indifference' as to its known or obvious consequences." *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). A municipality is deliberately indifferent when it "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Notice can come from "the existence of a pattern of tortious conduct" or facts showing that a constitutional violation is a "'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* at 1307–08 (quoting *Brown*, 520 U.S. at 409).

The second amended complaint alleges that the county had actual or constructive notice. For instance, an internal report highlighted intake deficiencies, which resulted in constitutional violations. The report also identified actions that could prevent additional deaths from withdrawal, including better documentation, orientation for medical personnel, and improved procedures to designate inmates needing medical attention. This

53

internal investigation, which preceded Mr. Ortiz's death, could have alerted the county to a need for corrective action.[14]

The 2003 DOJ report also could have given the county notice that intake deficiencies had been commonplace. Although a private company ran the facility at the time, the report could still render a constitutional violation "highly predictable." *Barney*, 143 F.3d at 1308 (quoting *Brown*, 520 U.S. at 409). We can also reasonably infer an absence of corrective action in light of Mr. Ortiz's death and the alleged deficiencies in his intake.

\* \* \*

In the second amended complaint, the plaintiffs adequately allege deliberate indifference by Santa Fe County. The district court thus erred by denying leave to amend by adding a § 1983 claim against the county.

## V.    Conclusion

In my view, the proposed second amended complaint states a valid claim against Nurse Robinson, Officer Chavez, Officer Valdo, Officer

---

[14]    The county argues that Mr. DeLaura's death is immaterial because it occurred after Mr. Ortiz had died. But this argument misunderstands the inquiry. The other incidents need not have caused Mr. Ortiz's injury. Instead, the other incidents must contribute to a custom that caused Mr. Ortiz's injury. Mr. DeLaura's subsequent death could contribute to the inference of an unconstitutional custom, and the preceding deaths and reports could help establish notice.

Lopez, Officer Garcia, and Corporal Gallegos. Based on the plaintiffs' allegations, a fact finder could reasonably infer that

- Mr. Ortiz's serious risk of harm would have been obvious to these employees and

- these employees knowingly disregarded that risk.

Their alleged inaction would have violated Mr. Ortiz's clearly established constitutional right, so I would reverse the dismissal and the denial of leave to amend the allegations against the six employees.

The district court also erred in disallowing an amendment to add a § 1983 claim against Santa Fe County.

I would thus (1) reverse the dismissal and denial of leave to file a second amended complaint and (2) remand for further proceedings.