**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ESTATE OF MADISON JODY JENSEN,
by her personal representative Jared
Jensen,

     Plaintiff - Appellee,

v.

JANA CLYDE,

     Defendant - Appellant,

and

DUCHESNE COUNTY, a Utah
governmental entity; DAVID BOREN;
JASON CURRY; LOGAN CLARK;
KENNON TUBBS; ELIZABETH
RICHENS; CALEB BIRD; HOLLIE
PURDY; GERALD J. ROSS, JR.; JOHN
DOES,

     Defendants.

No. 20-4024

_____

THE ESTATE OF MADISON JODY
JENSEN, by her personal representative
Jared Jensen,

     Plaintiff - Appellee,

v.

KENNON TUBBS, an individual,

     Defendant - Appellant,

No. 20-4025

and

DUCHESNE COUNTY, a Utah governmental entity; DAVID BOREN, an individual; JASON CURRY, an individual; JANA CLYDE, an individual; LOGAN CLARK, an individual; ELIZABETH RICHENS, an individual; CALEB BIRD, an individual; HOLLIE PURDY, an individual; GERALD J. ROSS, JR., an individual; JOHN DOES 1-20,

Defendants.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:17-CV-01031-DBB-EJF)**

_____

Frank D. Mylar (Andrew R. Hopkins, with him on the briefs), Mylar Law, P.C., Salt Lake City, Utah, for Defendant - Appellant Jana Clyde.

Cortney Kochevar, Richards Brandt Miller Nelson, Salt Lake City, Utah, for Defendant - Appellant Kennon Tubbs.

Ryan B. Hancey (Scott S. Bridge, with him on the brief), Kesler & Rust, Salt Lake City, Utah, for Plaintiff - Appellee.

_____

Before **HOLMES** and **KELLY**, Circuit Judges, and **LUCERO**, Senior Circuit Judge.

_____

**KELLY**, Circuit Judge.

_____

This case arises from the tragic death of 21-year-old Madison Jensen while in custody of the Duchesne County Jail. Ms. Jensen was arrested after her father alerted law enforcement to her drug use and possession of drug paraphernalia. Her estate

2

brought this action for deprivation of civil rights under color of state law. 42 U.S.C. § 1983. The district court granted summary judgment in favor of the county and qualified immunity to jail supervisors and staff. See Estate of Jensen v. Duchesne Cnty., No. 2:17-cv-1031, 2020 WL 291398 (D. Utah Jan. 21, 2020). It denied qualified immunity to jail medical personnel, Defendants-Appellants (Nurse) Jana Clyde and Dr. Kennon Tubbs. The district court held that genuine issues of material fact precluded qualified immunity on the Estate's claims of (1) deliberate indifference to serious medical needs against Nurse Clyde, and (2) supervisory liability against Dr. Tubbs. Our jurisdiction arises under 28 U.S.C. § 1291. See Brown v. Montoya, 662 F.3d 1152, 1161–62 (10th Cir. 2011). Exercising de novo review, we affirm as to Ms. Clyde and reverse as to Dr. Tubbs.[1]

**Background**

On Sunday, November 27, 2016, a Duchesne County Sheriff's deputy responded to a call from Ms. Jensen's father. When the officer arrived, Ms. Jensen told him that she was "coming off" heroin, recently smoked marijuana, and was taking various drugs prescribed by her doctor. Ms. Jensen was arrested for possession of drugs and drug paraphernalia and taken to the Duchesne County jail. Ms. Jensen was booked into jail by

---

[1] The Estate also argues in a footnote that we should summarily affirm or, at the very least, award attorneys' fees due to defendants' failure to file an adequate appendix under 10th Cir. R. 30.1(B)(1). Aplee. Br. at 10–11 n.3. We decline to grant either form of relief. See United States v. Hardman, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.")

3

Deputy Richens, who had Ms. Jensen complete an intake questionnaire. Ms. Jensen disclosed that she had been taking various prescriptions, provided her history of using drugs, and stated that she recently used heroin. Deputy Richens placed the completed form in a medical box for the jail nurse, Ms. Clyde.

Ms. Clyde was the jail's only Licensed Practical Nurse ("LPN"). She assisted inmates in obtaining prescriptions, administered medications, checked vital signs, and reported to her superiors. An LPN designation does not require an associate's or bachelor's degree, and Ms. Clyde was prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.

The jail also contracted with a private doctor to provide some medical services for inmates including on-call services. Dr. Tubbs agreed to "provide training, instruction, support, and a supervisory role of nursing staff on how to appropriately handle triage, sick call, medical protocols, and health care complaints/grievances." 3 Aplt. App. 17–22. He did not specifically contract to create medical protocols or policies for the jail as a whole. Dr. Tubbs subcontracted with a physician's assistant ("PA"), Logan Clark, who would make weekly visits to the jail to provide medical care. Dr. Tubbs also provided 24/7 on-call services for the jail, and staff knew that they could call him or PA Clark at any time. 2 Aplt. App. 171. However, Dr. Tubbs was never contacted prior to Ms. Jensen's death. Ultimately, Dr. Tubbs served as the jail's medical director and would visit three or four times a year, while PA Clark was the jail's primary provider.

Following Ms. Jensen's booking, she was placed in a cell with another woman. Approximately 10 minutes after arriving, Ms. Jensen complained of feeling sick and then

4

vomited.  Ms. Jensen continued to throw up and suffer from diarrhea the rest of that day and night.  Other officers were aware of this and knew that Ms. Jensen had been using heroin a few days before arriving at the jail.

The following morning, Deputy Richens took Ms. Jensen to see Ms. Clyde at the medical office.  During that visit, Ms. Clyde thought Ms. Jensen was doing serious drugs and that she looked like "a walking skeleton."  2 Aplee. App. 50–51.  Ms. Jensen told Ms. Clyde that she had been vomiting and thought she had a stomach bug, and Ms. Clyde told her to save the vomit and diarrhea for observation.  Deputy Richens also informed Ms. Clyde that Ms. Jensen had been using heroin a few days prior and had tested positive for opiates upon her arrival at the jail.  Ms. Clyde took Ms. Jensen's vital signs, gave her Gatorade, and administered one of Ms. Jensen's prescriptions after confirming with PA Clark on the phone.  Ms. Jensen continued to be ill the rest of that day, and jail staff were called to her cell several times due to her vomiting.

On Tuesday, Ms. Jensen mostly stayed in bed, did not eat her meals, and continued to vomit.  Deputy Richens again took Ms. Jensen to see Ms. Clyde and told her that Ms. Jensen was still vomiting.  Ms. Clyde states that she was not informed of the continued vomiting because, if she had been, she would have gone to Ms. Jensen's cell to determine how much vomit there was and if there was any blood.  During this visit, Ms. Clyde did not take Ms. Jensen's vital signs.  Later that day, Ms. Jensen's cellmate called a deputy to tell him that Ms. Jensen was vomiting so much that it was causing a mess. That night, Ms. Jensen was taken out of her cell, but due to her dizziness and difficulty

5

walking, she was placed in a medical observation cell. Ms. Clyde agreed with this move. Ms. Jensen continued to lay in bed and vomit, and she was given more Gatorade.

After Deputy Richens told Ms. Clyde that Ms. Jensen was weak and having a hard time walking, Ms. Clyde asked to have Ms. Jensen fill out a medical request form to see PA Clark when he visited the jail in two days. Ms. Jensen indicated on the form that she had been "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water." 1 Aplee. App. 89. Ms. Clyde reviewed the form but thought Ms. Jensen's comments about vomiting for four days referred to dates before she arrived at jail; however, she did not seek more information. At the time, Ms. Clyde did not tell PA Clark or Dr. Tubbs about Ms. Jensen's condition.

On Wednesday, Ms. Clyde went to Ms. Jensen's observation cell to give her Gatorade but did not take her vital signs. Deputy Bird, who took Ms. Jensen's medication to her cell, noted that Ms. Jensen was unable to get out of bed and that there was vomit in the cell. He then told Ms. Clyde that Ms. Jensen looked sick and could use some help.

Finally, on Thursday, jail staff reported to Ms. Clyde that Ms. Jensen had been vomiting through the night, and Ms. Clyde agreed to give her more Gatorade. Jason Curry, the jail commander, arrived that day and talked with Ms. Clyde about Ms. Jensen's condition discussing the possibility that she was going through heroin withdrawal. Ms. Clyde reaffirmed that she thought it was a stomach bug. Around 1:00 p.m., the jail's video recording system captured Ms. Jensen drinking some water, vomiting a brown substance, then rolling off her bed and having a seizure.

6

Approximately 30 minutes later, Ms. Clyde and PA Clark discovered Ms. Jensen had died in her cell. PA Clark was at the jail that day to see patients, however Ms. Clyde did not inform him of Ms. Jensen's condition until after he had treated the other inmates. The cause of death was cardiac arrhythmia from dehydration due to opiate withdrawal. Ms. Jensen had gallstones, which was evidence of extreme dehydration, and lost 17 pounds from the time she was booked.

While Ms. Jensen was at the jail, Dr. Tubbs was never contacted by Ms. Clyde or other jail staff about her condition. Ms. Clyde stated that had she been aware of Ms. Jensen's actual condition she would have called PA Clark or Dr. Tubbs based on her training and common sense. But there was a conflict about when jail staff should contact them regarding an inmate who is vomiting or showing signs of dehydration. There was also not a specific written policy about when to take and record vital signs for an inmate experiencing opiate withdrawal symptoms. Ultimately, Ms. Clyde and Dr. Tubbs had not heard of someone dying due to opiate withdrawal, and this was the first incident in Dr. Tubbs' 19 years of working with inmates.

**Discussion**

We normally lack jurisdiction over the denial of summary judgment. Cox v. Glanz, 800 F.3d 1231, 1242 (10th Cir. 2015). However, when the district court denies qualified immunity to a public official, that decision is immediately appealable when it involves an abstract issue of law, rather than one of evidentiary sufficiency. Id. The district court denied qualified immunity based on genuine

7

disputes of material fact. See Estate of Jensen, 2020 WL 291398, at *15–16. As a result, defendants contend that the district court applied an incorrect standard of review by "improperly conflat[ing] the summary judgment standard with qualified immunity's two-part analysis." Aplt. Tubbs Br. at 19; see Aplt. Clyde Br. at 27.

Of course, when a defendant raises a qualified immunity defense on summary judgment, a plaintiff must respond with evidence tending to show that: (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time in question. Ullery v. Bradley, 949 F.3d 1282, 1289 (10th Cir. 2020). While defendants are correct that the district court did not exactly follow this analysis, this does not require automatic reversal (as defendants urge) and we may exercise jurisdiction. See Cox, 800 F.3d at 1243.

When we review a district court's denial of qualified immunity on summary judgment, we generally "take, as given, the facts that the district court assumed when it denied summary judgment" and make our legal determination regarding qualified immunity. Johnson v. Jones, 515 U.S. 304, 319 (1995). When it is unclear exactly what facts the district court relied upon, it may be necessary to review the record, in the light most favorable to the non-moving party, to ascertain which facts the district court likely assumed. Id. While Dr. Tubbs seems to understand that this is the standard, see Aplt. Tubbs Br. at 20, Ms. Clyde raises additional factual arguments. In her brief she suggests that even if we ordinarily defer to the district court's factual recitation, we should not do so here because the court failed to "identify the particular charged conduct" and its version of the facts is "blatantly contradicted by

8

the record." Aplt. Clyde Br. at 25 (quoting Lewis v. Tripp, 604 F.3d 1221, 1225–26 (10th Cir. 2010)). But our task is not to determine whether there are genuine issues of material fact. Rather, we ask whether the conduct attributed to the defendant seeking qualified immunity, which the district court found to be supported by the record (and which will often be controverted), would still entitle the defendant to qualified immunity. Behrens v. Pelletier, 516 U.S. 299, 312–13 (1996). That standard is satisfied here. The district court made clear which facts it found supported denying qualified immunity. Therefore, we proceed to consider whether Ms. Clyde and Dr. Tubbs are entitled to qualified immunity.

## A. Dr. Tubbs

The Estate argues that Dr. Tubbs is not entitled to qualified immunity because he is a private doctor. The district court noted that the Tenth Circuit had yet to decide that specific issue. Estate of Jensen, 2020 WL 291398, at *15 (citing Kellum v. Mares, 657 F. App'x 763, 768 n.3 (10th Cir. 2016)). However, it ultimately determined that Dr. Tubbs would not be able to assert qualified immunity because there were factual questions as to whether he was deliberately indifferent. Id. We disagree and conclude that (1) Dr. Tubbs is entitled to assert qualified immunity under the particular facts of this case, and (2) Dr. Tubbs did not violate Ms. Jensen's clearly established constitutional rights.

### 1. Whether Dr. Tubbs May Claim Qualified Immunity

Because Dr. Tubbs is a private physician, as opposed to a government employee, we must determine whether he is entitled to claim qualified immunity.

9

See Weise v. Casper, 507 F.3d 1260, 1264 (10th Cir. 2007). When answering this question, we look "both to history and to 'the special policy concerns involved in suing government officials.'" Richardson v. McKnight, 521 U.S. 399, 404 (1997) (quoting Wyatt v. Cole, 504 U.S. 158, 167 (1992)). Under this framework, the Supreme Court has denied the qualified-immunity defense to private prison guards, id. at 412, but has granted it to a private attorney retained by the government to conduct an internal investigation, Filarsky v. Delia, 566 U.S. 377, 393–94 (2012). Since Filarsky was decided, we have allowed a private doctor performing prisoner executions to claim qualified immunity. Estate of Lockett by & through Lockett v. Fallin, 841 F.3d 1098, 1108–09 (10th Cir. 2016).

Beginning with history, we consider "the common law as it existed when Congress passed § 1983 in 1871." Filarsky, 566 U.S. at 384. In Filarsky, the Supreme Court stated that § 1983 is to be read "in harmony with general principles of tort immunities and defenses" and those principles will apply unless abrogated by the legislature. Id. at 389 (citations omitted). One of these principles is that immunity should not vary depending on whether the individual works for the government on a part-time or full-time basis. Id. Accordingly, the Court determined that a private attorney retained on a part-time basis to conduct an internal investigation had common-law grounds for claiming immunity. Id.

Likewise, Dr. Tubbs was carrying out government responsibilities — namely, providing medical services to inmates — but was merely doing so on a part-time basis. He was working alongside the jail's officers and LPN, Ms. Clyde, whose full-

10

time job was to monitor and provide some care for the inmates. In fact, had Dr. Tubbs been working as a doctor for the county on a full-time basis (e.g., like Ms. Clyde does as an LPN), he would have certainly been able to raise a qualified-immunity defense. Cf. Estate of Lockett, 841 F.3d at 1108–09. Thus, common law principles support Dr. Tubbs' ability to raise a qualified-immunity defense.

Turning next to the policy considerations, three objectives guide our analysis: (1) protecting against "unwarranted timidity on the part of public officials;" (2) ensuring "that talented candidates are not deterred by the threat of damages suits from entering public service;" and (3) guarding against employees being distracted from their duties. Richardson, 521 U.S. at 408–411 (internal quotations omitted). Given the unique facts of this case, these concerns support our conclusion that Dr. Tubbs may raise the defense.

The first and most important consideration is preventing unwarranted timidity on the part of government workers. See Richardson, 521 U.S. at 409. This concern is critical because we want to ensure that those working on behalf of the government "do so 'with the decisiveness and the judgment required by the public good.'" Filarsky, 566 U.S. at 390 (quoting Scheuer v. Rhodes, 416 U.S. 232, 240 (1974)). In Richardson, this concern cut against allowing immunity. There, the Court was convinced that the strong market pressures faced by the private prison would overcome any "overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." Richardson, 521 U.S. at 410. In particular, the private prison was "systematically organized to perform a major administrative task for

11

profit," it had less state supervision, it had insurance to cover civil rights tort liability, and it had pressure from competing firms that could take over the contract. Id. at 409–10.

Dr. Tubbs' situation is different. Dr. Tubbs essentially ran a two-man shop (including his subcontract with PA Clark) when providing a discrete function to the prison. While Dr. Tubbs had some leeway in his decisions, it was the county that was in charge of implementing policies and training its officers. Dr. Tubbs was required to provide care in accordance with Utah Department of Corrections and Utah Medicaid guidelines, the county had to authorize any elective care, and Dr. Tubbs could only prescribe medication from the prison's formulary. 3 Aplt. App. 17. Even though Dr. Tubbs had agreed to supervise and train Ms. Clyde, he still had no ability to discipline or fire her. See Richardson, 521 U.S. at 410–11. In this capacity, Dr. Tubbs does not resemble a private doctor working in a private firm. See id. at 410. As observed by the Fifth Circuit, private doctors providing services at a jail "act within a government system, not a private one," and "market pressures at play within a purely private firm simply do not reach them there." Perniciaro v. Lea, 901 F.3d 241, 253 (5th Cir. 2018).

Second, talented candidates could be deterred from furnishing important public services if the qualified-immunity defense was not available in this type of case. The government has a strong interest in attracting individuals with "specialized knowledge or expertise" to public service, often on a part-time basis. Filarsky, 566 U.S. at 390. Here, the Duchesne County jail (like many other jails) opted not to have

12

an in-house doctor but instead use Dr. Tubb's 24/7 on-call service and weekly visits to address its medical needs. Because a physician like Dr. Tubbs does not "depend on the government for [his] livelihood," he would be free to pursue work that did not expose him to comparable liability. Id. Furthermore, there is a possibility that Dr. Tubbs "could be left holding the bag," considering many of the jail's officers have already been granted qualified immunity. Id. at 391. We doubt that a private doctor has the market power to insist on conditions to ameliorate the risk inherent in this situation.

Third, we must consider the interest in protecting employees from the distraction that litigation may cause while performing their official duties. Although this concern alone is not "sufficient grounds for an immunity," Richardson, 521 U.S. at 411, this case raises the possibility that both Dr. Tubbs and those he worked with could be distracted by this litigation. See Filarksy, 566 U.S. at 391.

The Estate relies heavily on McCullum v. Tepe, 693 F.3d 696 (6th Cir. 2012), to argue that qualified immunity does not apply to Dr. Tubbs.[2] In that case the Sixth

---

[2] The Estate also points to other circuits concluding that qualified immunity is not available to a private medical professional providing services to a jail. See Estate of Clark v. Walker, 865 F.3d 544, 551 (7th Cir. 2017) (denying qualified immunity to private nurse); McCullum v. Tepe, 693 F.3d 696, 704 (6th Cir. 2012) (denying qualified immunity to private psychiatrist); Jensen v. Lane Cnty., 222 F.3d 570, 577 (9th Cir. 2000) (same); Hinson v. Edmond, 192 F.3d 1342, 1347 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000) (denying qualified immunity to private physician). But see Perniciaro v. Lea, 901 F.3d 241, 255 (5th Cir. 2018) (allowing private psychiatrists to assert the qualified-immunity defense). As the Fifth Circuit points out, many of these cases were decided pre-Filarsky and may not align precisely with Filarsky's mode of analysis. See Perniciaro, 901 F.3d at 252 n.9.

Circuit analyzed whether a private psychiatrist working for a prison "would have been immune from a suit for damages at common law." Id. at 702. After reviewing 18th- and 19th-century cases, the court concluded there was no common-law tradition of immunity for private doctors. Id. at 702–04. As for the policy considerations, the Sixth Circuit highlighted the need to deter constitutional violations and the fact that the doctors could offset liability with better pay and benefits. Id. at 704. Although Tepe provides persuasive support for the Estate's argument, we believe the circumstances of this case — i.e., an individual doctor with limited control over policy working alongside government employees — compel a different result. We also question whether Tepe's historical analysis fully comports with the Supreme Court's analysis in Filarsky. See Perniciaro, 901 F.3d at 252 n.9 ("With respect for [the Sixth Circuit's] deep historical analysis of whether doctors had any special immunity at common law, we read *Filarsky* to require a different focus." (citation omitted)). The Filarsky Court was clear that the common law provided individuals with "immunity for actions taken while engaged in public service on a temporary or occasional basis." 566 U.S. at 388–89. That determination controls the outcome of this case.

Therefore, given the common law principles and underlying policy concerns, we conclude that Dr. Tubbs may claim qualified immunity. However, we highlight the unique circumstances of this case that led to allowing Dr. Tubbs to raise the defense. See Richardson, 521 U.S. at 413 (answering the qualified immunity question narrowly and based on context); Estate of Lockett, 841 F.3d at 1108.

14

## 2. Supervisory Liability and Qualified Immunity

The Estate bases its supervisory liability claim on Dr. Tubbs' failure to establish a protocol or provide training to Ms. Clyde. The Estate must establish three elements: "(1) personal involvement; (2) causation; and (3) state of mind." Keith v. Koerner, 843 F.3d 833, 838 (10th Cir. 2016). A supervisor is personally involved when he or she created, promulgated, implemented, or had responsibility over the policy at issue. Id. It can also be shown by a "complete failure to train" or such "reckless or grossly negligent" training that makes misconduct nearly inevitable. Id. For causation, the Estate must show that Dr. Tubbs "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [Ms. Jensen] of her constitutional rights." Id. at 847 (citation omitted). Finally, for the state-of-mind element, Dr. Tubbs must have "knowingly created a substantial risk of constitutional injury." Id. at 848 (citation omitted).

Although Dr. Tubbs' set of protocols and training may not have been the most robust, the facts demonstrate that the Estate cannot establish the requisite degree of personal involvement, causation, and state of mind to impose supervisory liability. As noted, Ms. Clyde was an LPN who had limited ability in providing medical services to inmates. She could not prescribe medications, conduct health assessments, or diagnose medical conditions. While she received some training from Dr. Tubbs and PA Clark and had training as a part of licensure, her job often comprised of notifying Dr. Tubbs and PA Clark when medical issues arose. As a result, Dr. Tubbs had in place a 24/7 on-call system where Ms. Clyde or any jail

15

officers could call him or PA Clark with their concerns. In fact, Ms. Clyde specifically testified in her deposition that had she been aware of an inmate "complaining of puking for four days straight, runs, diarrhea, can't hold anything down, not even water," she would have immediately called PA Clark or Dr. Tubbs. 4 Aplt. App. 107. She knew this based on both her training and on her common sense. Given that Ms. Clyde knew she could call Dr. Tubbs when Ms. Jensen presented with these symptoms, we cannot conclude that any alleged failings by Dr. Tubbs to implement policies or provide training caused Ms. Jensen's death.

Even if we were to conclude that the Estate established a viable claim for supervisory liability, the right involved was not clearly established. For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Quinn v. Young, 780 F.3d 998, 1004–05 (10th Cir. 2015) (alteration omitted) (quoting Wilson v. Montano, 715 F.3d 847, 852 (10th Cir. 2013)). We do not define the right "at a high level of generality," but rather it "must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (citations omitted).

For clearly established law, we typically require "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . ." Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1106 (10th Cir. 2014). Here, the Estate relies almost exclusively on a Sixth Circuit decision and an unpublished district court decision and we are not persuaded. See Shadrick v. Hopkins Cnty., 805 F.3d 724 (6th Cir. 2015); Jenkins v. Woody, No. 3:15-cv-355, 2017 WL 342062

16

(E.D. Va. Jan. 21, 2017). Any comparison to <u>Keith</u> lacks the necessary factual similarities. In that case, we concluded that the warden in charge of the prison could be found deliberately indifferent to sexual abuse by its employees. See <u>Keith</u>, 843 F.3d at 846–47. That is not enough to make it clear to Dr. Tubbs that he was violating Ms. Jensen's rights in this context.

For these reasons, Dr. Tubbs is entitled to qualified immunity.

**B. Ms. Clyde**

The Estate bases its claim of deliberate indifference to serious medical needs against Ms. Clyde on her failure to secure medical treatment despite obvious risks to Ms. Jensen's health. Ms. Clyde contends that she took reasonable steps to provide care and that she was not aware that Ms. Jensen faced serious medical needs. She also argues that even if she violated Ms. Jensen's rights, those rights were not clearly established. The district court denied qualified immunity noting that a reasonable jury could conclude that she was deliberately indifferent depending on some of the operative facts which were in dispute. <u>Estate of Jensen</u>, 2020 WL 291398, at *16.

A claim for deliberate indifference to serious medical needs has an objective and subjective element. <u>Quintana v. Santa Fe Bd. of Comm'rs</u>, 973 F.3d 1022, 1028–29 (10th Cir. 2020). The objective element considers whether the harm suffered was sufficiently serious. <u>Id.</u> at 1029. Ms. Clyde does not appear to contest this issue on appeal. Aplt. Clyde Br. at 29. The subjective element asks whether Ms. Clyde "knew [Ms. Jensen] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." <u>Quintana</u>, 973 F.3d at 1029 (quoting

17

Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)).  Thus, the Estate must show that Ms. Clyde was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and she must "draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  This can be established when the risks would be obvious to a reasonable person.  Mata v. Saiz, 427 F.3d 745, 752 (10th Cir. 2005).  We conclude that the Estate has sufficiently shown deliberate indifference.

Relying on Quintana, Ms. Clyde contends that "frequent vomiting alone does not present an obvious risk of severe and dangerous withdrawal," something more, such as bloody vomit, is needed.  See 973 F.3d at 1029–30.  But here, there was something more.  Viewing the facts in the light most favorable to the Estate, evidence has shown Ms. Clyde was aware that: Ms. Jensen had opiates in her system; she looked sick and was "walking like a skeleton"; she had been soiling her sheets and had diarrhea; she had been vomiting for four days straight; and that she was unable to keep food or water down.  We believe that these circumstances — particularly her self-report that she had been vomiting for four days and could not keep down water — present a risk of harm that would be obvious to a reasonable person.  See Mata, 427 F.3d at 752.

Despite this obvious risk to Ms. Jensen, Ms. Clyde failed to take any reasonable measures.  Ms. Clyde testified that had she been aware of an inmate "complaining of puking for four days straight, runs, diarrhea, can't hold anything down, not even water," she would have immediately called PA Clark or Dr. Tubbs.  4

18

Aplt. App. 107. However, the Estate's evidence shows that she was aware of those exact symptoms but failed to call Dr. Tubbs or PA Clark. Even when PA Clark was present at the jail on Thursday, Ms. Clyde did not inform him about Ms. Jensen's condition until the end of his rounds. It appears the only course of action Ms. Clyde really took was approving of the decision to place her in a medical observation cell and giving her Gatorade. These are hardly reasonable measures given the dire circumstances. Cf. Sealock v. Colorado, 218 F.3d 1205, 1208, 1210–11 (10th Cir. 2000). And to the extent Ms. Clyde classifies her conduct as a "misdiagnosis," a trier of fact could conclude that she did not just misdiagnose Ms. Jensen, she "completely refused to fulfill her duty as gatekeeper." Mata, 427 F.3d at 758.

Finally, Ms. Clyde argues that even if she did violate Ms. Jensen's rights, those rights were not clearly established as of November 2016. However, in Quintana we concluded that in January 2016 — ten months prior to Ms. Jensen's death — it had been "clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." 973 F.3d at 1033 (reaching this conclusion based on Mata v. Saiz and Sealock v. Colorado). We concluded that *in the specific context* of an officer disregarding symptoms of heroin withdrawal and internal injury. Id.

Ms. Clyde attempts to distinguish this trio of cases — Quintana, Mata, and Sealock — by arguing that she, unlike the defendants in those cases, did something to help Ms. Jensen. However, Ms. Clyde faced a similar situation as the PA in Sealock. There, the evidence showed that the PA was informed of an inmate's chest pain, so

19

the PA gave him a shot of Phenergan and told him to rest.  <u>Sealock</u>, 218 F.3d at 1208. The PA later testified that had he been told of chest pain he would have immediately called an ambulance.  <u>Id.</u> at 1211.  We ultimately concluded that when an individual's sole purpose is "to serve as a gatekeeper for other medical personnel," and that person delays or refuses to fulfill the gatekeeper role, he may be liable for deliberate indifference.  <u>Id.</u>  Ms. Clyde was the gatekeeper in this case and she failed to fulfill that role when she chose to give Ms. Jensen Gatorade instead of calling Dr. Tubbs or PA Clark.  Accordingly, <u>Sealock</u> provided sufficient notice to Ms. Clyde that what she was doing violated Ms. Jensen's rights to medical care.  See <u>Quinn</u>, 780 F.3d at 1004–05.

For these reasons, we affirm the district court's decision that Ms. Clyde is not entitled to qualified immunity.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.